[L. A. No. 19962. In Bank. Sept. 23, 1948.]

CHAS. L. NICHOLS, Respondent, v. JOHN S. MITCHELL et al., Appellants.

Chase, Rotchford, Downeu & Chase and Ransom W. Chase for Appellants.

William R. Law, George Acret and Julius V. Patrosso for Respondent.

SPENCE, J.—Plaintiff brought this action for declaratory relief and to quiet title to certain real property in the city of Los Angeles following his purchase thereof on execution in partial satisfaction of a judgment for $59,141 stemming from a promissory note for $50,000 which defendant John S. Mitchell had made in favor of Mrs. Genevieve D. Turner and which, after its second renewal, she had assigned to plaintiff. The defense to this action rested upon the claim that Helen F. Mitchell, the wife of the judgment debtor and other defendant herein, had furnished the consideration for the purchase of the realty in question, and it therefore was her separate property. Mrs. Mitchell also cross-complained in this action for $5,000 damages for the placing of a cloud upon her title.

The trial court found, among other things, that the Mitchells were married on March 31, 1928, and that the realty here involved was the community property of the parties at the time of execution; that the separate "interest in said real property" claimed by "Helen F. Mitchell [was] unfounded and without right"; that "any right or claim" that defendant "Helen F. Mitchell may have had to said property by reason of a community property interest, or otherwise, was terminated and extinguished by the said sale of said property under execution"; that "all of the money, funds or other property that went into the purchase of said property by the defendants . . . on or about the 27th day of November, 1937, and all the money or funds used to make the payments upon the note secured by deed of trust evidencing a part of the purchase price of said property have been made with community money, funds or other community property of" the defendants, and that "none of the money, funds or property that went into the purchase of said property was the separate property of Helen F. Mitchell"; that "all the separate property, if any, owned or possessed by defendant Helen F. Mitchell, at the time of her marriage to John S. Mitchell, or that was acquired by her sub-

sequent to her said marriage, became commingled with the community property of said defendants to such an extent that its identity was absolutely lost, and it is impossible to trace said separate property, and the real property herein mentioned was acquired by said parties after marriage by community funds and was the community property of said parties at the time of the sales above mentioned." The court further found that "the reasonable rental value of said property since the 20th day of November, 1944, [was] the sum of $100.00 per month"; and "referring to defendant Helen F. Mitchell's cross-complaint," that it was "not true" that her "title to said property [had] been slandered to [her] damage in the sum of $5,000.00, or in any other sum, or at all," but that "all the acts of [the] cross-defendant Chas. L. Nichols in connection with the sale of said property were legal and in accord with [his] rights under his said judgment against said defendant John S. Mitchell." Accordingly, judgment was entered decreeing that "plaintiff . . . is the owner of . . . and . . . is entitled to the immediate possession of" said real property; that "neither of [defendants]" has "any right, title or interest" therein; that "plaintiff . . . recover from [defendants] the sum of $100.00 per month for the use or rental of said real property from November 20, 1944, to date of this judgment"; and that "defendant Helen F. Mitchell take nothing by her cross-complaint, and that the same be dismissed." From such judgment and the order denying their motion for a new trial, defendants have appealed. Since said order is nonappealable, the appeal therefrom should be dismissed. (Code Civ. Proc., § 963; 2 Cal.Jur. § 34, p. 173; *Roberts* v. *Brae,* 5 Cal.2d 356, 360 [54 P.2d 698].)

As ground for reversal defendants urge the insufficiency of the evidence to sustain the findings that the realty involved was their community property, and not the separate property of Mrs. Mitchell. Such contention requires defendants to demonstrate that there is no substantial evidence to support the challenged findings. As was stated in the oft-cited case of *Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427, at page 429 [45 P.2d 183] : ". . . the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," which will support the findings, and when "two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial

court." (See, also, *Raggio* v. *Mallory,* 10 Cal.2d 723, 725 [76 P.2d 660]; *Fischer* v. *Keen,* 43 Cal.App.2d 244, 248 [110 P.2d 693]; *Laherty* v. *Connell,* 64 Cal.App.2d 355, 357 [148 P.2d 895]; *Wuest* v. *Wuest,* 72 Cal.App.2d 101, 104 [164 P.2d 32].) Careful review of the record here, in the light of these fundamental principles of law, does not sustain defendants' attack upon the propriety of the trial court's determination, and the judgment must be affirmed.

From the record it appears that the deed to the property here in question ran to "Helen F. Mitchell, a married woman," and was recorded on November 27, 1937. Defendants testified that the purchase to the extent of $5,000 was handled through an escrow, with a note for that amount and a deed of trust as security therefor, dated November 15, 1937, and covering the property, executed by Helen F. Mitchell alone; that part of the $5,000 was used to retire an existing mortgage on the property and the balance was paid to the seller; that the escrow instructions, which were introduced in evidence, referred to the fire insurance policy on the property as in the name of Helen F. Mitchell, with the "Loss Payable Clause" in favor of the payee of the $5,000 note; that as additional consideration for the purchase of the property—a house and lot—certain securities were delivered to the seller outside of the escrow. Mrs. Mitchell claimed that these securities represented some stocks and bonds, as well as bank savings, which she "had originally had" before marriage and which thereafter "had been transferred, invested and re-invested" by her husband as "he would make a little money and sell it out and put it into something else." At another point in her testimony, Mrs. Mitchell stated that she "had quite a bit of money when [she] was married . . . quite a bit over a thousand dollars and quite a bit of that was invested by [her] husband, [that] there was no reason for [her] to keep it [since] he was doing very well and [she] had a good income from him." She further stated that "the total amount of [the] securities that went on [the] house was approximately $1,200.00 . . . it may have been more," that she "paid between $7,500.00 and $8,500.00 for the property" but that when she "actually bought the property [she] only owed $5,000.00 on it"—the above-mentioned loan subject of the escrow.

When questioned as to the handling of the payments on the house since its purchase in 1937, Mrs. Mitchell admitted that she "probably" had not "paid all of them," that her "hus-

band at times would take cash and buy a cashier's check, which [she] would give to him . . . that often [she] would settle the rest of it, he would take it out of [her] allowance.'' In addition, according to her testimony, Mr. Mitchell ''since 1937 . . . made one payment of taxes one year . . . that was one thing he definitely made with his own money.'' Mrs. Mitchell also maintained that after her marriage she ''always'' kept ''a separate bank account,'' into which were deposited (1) her earnings as a substitute school teacher for ''three and a half months,'' (2) moneys received from her parents as ''presents at Christmas time ($100) and birthdays ($30)'' and as reimbursement after visits of a week or more at her home, and (3) such savings as she might have from her household allowance, ''$10.00 a week and very often more.'' At other times in her testimony she correlated her reputed separate savings account with a ''household account'' opened by her husband in her name, as she herself ''was never in the bank,'' and she stated that it would be ''closed out'' when her ''husband didn't have enough money to keep up that household bank account,'' that she then ''didn't have a bank account'' for awhile but then a new one would be opened in her name at some other bank as finances would permit.

Mr. Mitchell testified that after working as a securities salesman for a bank for ''about four and one-half years,'' he formed an investment service in his own name—''John S. Mitchell Company''—''commencing in 1926 or '7'' and he continued in such business until March, 1938, when the last of the successive companies that he organized ''ceased to operate,'' and that he then went to work for a brokerage firm. He stated that at the time of their marriage in 1928, Mrs. Mitchell had some stock and cash which he thereupon undertook to handle for her, selling the original securities and ''re-investing'' the proceeds ''for her.'' He was unable to ''recall what the subsequent transactions were,'' and he said that he could not find the company records that were kept on the various investments he made for his wife because the company's books had been placed ''in storage,'' then ''got in a fire'' and were ''pretty near ruined.'' Mr. Mitchell stated that one of the persons whom he interested in his investment enterprise was Mrs. Genevieve D. Turner, who upon his advice ''purchased some . . . stock'' in the company when it was ''originally organized''—in ''1926 or '7''—and then turned over to it the management of ''securities of the value of more than a hundred thousand dollars''; that shortly there-

after he needed some money to carry through a "financing program" that he was promoting, and Mrs. Turner furnished some of the needed capital by permitting him to sell some of her "securities through John S. Mitchell Company," and with the proceeds—"somewhere between thirty and thirty-five thousand dollars"—to buy stock in his company in his name, for which he "gave her [his] note . . . and the certificates of stock issued"; that at the time of his marriage in 1928 he not only had pledged his "stock in John S. Mitchell Company" to Mrs. Turner, but he had also "hypothecated with her" his other principal property asset, an interest in "seven or eight lots in Palm Springs, California," leaving him only a cash "working account" for his business of "substantially less than a thousand dollars." He stated that he did "pretty well" with his investment service "during the '26, '7, '8, '9 years," "keeping [his] money in the business . . ., also paying on [the] notes to Mrs. Turner," but that "during the depression years" that followed, his "income was nil" and "on account of [the] debts that . . . accumulated, [he] had never been able to get any kind of a surplus to buy securities with or put into anything else as a matter of fact; . . . so that none of [his] earnings were involved in the securities which [he purchased] in Mrs. Mitchell's name." Because of the depression of 1929, he claimed that many of the "securities of Mrs. Turner's . . . eventually became lost or dissipated . . . [and] of no value"; that some of the bonds which the company held on her open account produced a small amount of interest and income which was "delivered" to her and "the company made some additional advances to her to help her"—"in the neighborhood of three to four thousand dollars"; and that "in 1934" he and Mrs. Turner "made a settlement" whereby the "shares of stock" in the John S. Mitchell Company, which were of "no value" and which she had "held as collateral," were "turned back to [him]," and he gave her his "note for $50,000.00" in addition to her holding the Palm Springs property. This was the "first note" to Mrs. Turner; it was subsequently renewed in 1938 and in 1942, and the latter renewal is the one here involved upon assignment by Mrs. Turner to plaintiff.

Mr. Mitchell maintained that "all of the money paid on account of [the] property" purchased in November, 1937, in the name of Mrs. Mitchell was "furnished by [her]"; that he "had nothing to do with that deal at all"; that he "opposed Mrs. Mitchell buying the house at the time"; that the

purchase was made through the delivery of his wife's securities plus the $5,000 escrow arrangement; that "outside of escrow there was no cash; the only cash amount that went in was the difference between what the former encumbrance was and the new encumbrance which Mrs. Mitchell assumed to pay off, and [the] securities. That was the total consideration for the property." As heretofore stated, Mr. Mitchell did not sign the $5,000 note or trust deed or any other document involved in the acquisition of the property in question, but only the name of Mrs. Mitchell appeared as concerned in the purchase. He named certain securities as having been delivered in consummation of the sale and of the value of approximately $2,000, but no records were introduced or other testimony elicited in regard to their identity. He admitted that after the purchase of the property, he made "maybe one or two or three of the payments" on the $5,000 note; that "Mrs. Mitchell had made some and sometimes it ha[d] been more convenient for [him] to send a check"; that "in each instance" of transmittal it was his practice to prepare a receipt reading in favor of "Helen F. Mitchell" for the payee's signature and to note "at the bottom" the reduced balance owing as each payment was made; and receipts in such form were accordingly introduced in evidence. Mr. Mitchell admitted that "from the time of [his] marriage on down to the institution of the proceedings resulting in the judgment that [plaintiff] obtained" as here involved, he kept his own "bank account"; but that "there wasn't anything in it to amount to anything during the depression," and "from 1934 on" when he had sufficient earnings for deposits therein, he was only able to make his "interest payments" on Mrs. Turner's note.

In opposition to this testimony of Mr. and Mrs. Mitchell directed to the point that the property in question was "purchased with money borrowed by Mrs. Mitchell and with certain securities" belonging to her as the premise for their claim that it therefore was her "separate property," plaintiff relies on the following evidence. Mrs. Turner, on behalf of plaintiff, testified that she first met Mr. Mitchell "in 1922 or '3, somewhere along there" when he was a "securities salesman" for the bank with which she did business; that she "had perfect confidence in him"; that when he went into business for himself—"in 1926 or '7"—she "turned over" to him securities, amounting to some $100,000, "for safekeeping"; that she never "did . . . get any of the securities back";

that "the last of them he put up at the bank and borrowed some money on them and couldn't pay it, and they were sold to pay, at public auction"; that she "found [this] out in 1930 [or] '31''; that thereafter she "turned [her] affairs over to [plaintiff]," who in 1934, negotiated the settlement involving the $50,000 note executed by Mr. Mitchell in her favor. Mrs. Turner was asked about "a conversation [she] had with Mr. Mitchell after this about what he was going to do with [his] property," and she replied that he had told her "years ago" that "somebody got a judgment against him on an automobile and he never would hold anything in his own name any more, he would put it in his wife's name . . . [so] nobody could touch it." When queried about "the extent of [her] acquaintanceship" with Mrs. Mitchell, Mrs. Turner testified that she first met Mrs. Mitchell after her marriage to Mr. Mitchell, that they became "very close, dear friends," that they went "driving together, to dinners," and "visited back and forth all the time" in "each other's house . . . sometimes two or three times a week"; that she had a conversation with Mrs. Mitchell shortly after 'the latter's marriage when "she told us about her getting married. She said it took nearly everything she had to get ready for the wedding and her clothes; and for a long time she didn't have any clothes because she didn't have any money coming in from her husband. And she substituted as a teacher occasionally. . . . She said she used her money that she had on hand to finance the wedding." Plaintiff also cites Mr. Mitchell's testimony that in 1943, he transferred to Mrs. Mitchell the title to a Pontiac automobile, which he had purchased "in [his] name in the year '41''; that at the time of the transfer, Mrs. Mitchell had a car of her own; that she did not "give [him] anything for it," and that he continued to "use the Pontiac car exclusively as his own car . . . approximately."

■■ Section 164 of the Civil Code provides, in part, that "whenever any real or personal property . . . is acquired by a married woman by an instrument in writing, the presumption is that the same is her separate property." However, "such presumption is a disputable one, in the form of evidence, and may be controverted by other evidence, direct or indirect (*Stafford* v. *Martinoni*, 192 Cal. 724 [221 P. 919]); and whether or not it is so controverted is a question of fact for the trial court, its conclusions, unless manifestly without sufficient support in the evidence, being conclusive on appeal."

(*Goucher* v. *Goucher*, 82 Cal.App. 449, 457-458 [255 P. 892] ; see, also, *Estate of Cronvall*, 220 Cal. 503, 504 [31 P.2d 372] ; *Estate of Bruggemeyer*, 115 Cal.App. 525, 537 [2 P.2d 534] ; *Truelsen* v. *Nelson*, 42 Cal.App.2d 750, 754 [109 P. 2d 996] ; *Williamson* v. *Kinney*, 52 Cal.App.2d 98, 102 [125 P.2d 920] ; *Wuest* v. *Wuest, supra,* 72 Cal.App.2d 101, 111.)

▇ Defendants argue that no evidence was introduced to dispel the presumption raised by section 164 of the Civil Code and to establish the community character of the property standing in the name of Mrs. Mitchell. To this end they cite their "uncontradicted testimony" that the purchase was made upon Mrs. Mitchell's delivery of her securities and the proceeds of a loan negotiated by her as her independent obligation (*Hogevoll* v. *Hogevoll,* 59 Cal.App.2d 188, 193-194 [138 P.2d 693]), that Mr. Mitchell had nothing to do with the transaction as established by the absence of his name from the papers constituting the escrow for the handling of the sale (*Estate of Ellis,* 203 Cal. 414, 416 [264 P. 743]), and that accordingly she, having furnished "the total consideration for the property," was properly named the sole grantee in the deed. But the trial court was not concluded by defendants' testimony as to the source of the consideration for the purchase of the property. It was entitled to consider the situation of the parties at the time of the purchase in 1937, the circumstances that may have occasioned the placing of the title in Mrs. Mitchell's name, and the legitimate inferences arising therefrom which precipitated into essential conflict the issue as to the separate or community character of the property. This province of the trial court to resolve "conflicting evidence or conflicting inferences" and to reach a conclusion that will not be disturbed "on appeal if some substantial evidence or reasonable inference" lends support thereto (*Security-First National Bank* v. *Bruder,* 44 Cal.App.2d 767, 772 [113 P. 2d 3]) was forcefully declared in the recent case of *Hicks* v. *Reis,* 21 Cal.2d 654, at pages 659-660 [134 P.2d 788] : *"The trier of the facts is the exclusive judge of the credibility of the witnesses.* (§ 1847, Code Civ. Proc.) While this same section declares that a witness is presumed to speak the truth, it also declares that 'This presumption, however, may be repelled by the manner in which he testifies, by the character of his testimony . . . or his motives, or by contradictory evidence.' In addition, in passing on credibility, the trier of the facts is entitled to take into consideration the interest of the

witness in the result of the case. (Citing authority.) *Provided the trier of the facts does not act arbitrarily, he may reject in toto the testimony of a witness, even though the witness is uncontradicted.* (Citing cases.) . . . [As] the court, in *Market Street Ry. Co.* v. *George,* 116 Cal.App. 572, 576 [3 P.2d 41], stated: 'It has always been the rule that courts and juries are not bound by mere swearing no matter how positive, unless it be credible swearing. It may bear within itself the seeds of its own destruction, as where it is inherently improbable, or its destruction may be wrought from without, as where the person swearing is in some manner impeached. In either case court and jury are entitled to disbelieve the testimony if they choose, and if they do refuse it credence it is of no more effect than if it had not been given. It disappears from the case and the inference opposed to it is no longer contradicated.' " (Emphasis added.)

Plaintiff's theory of recovery rested on the premise that the purchase was made with the proceeds of a loan made on the property—rather than on the personal credit of Mrs. Mitchell in recognition of her alleged separate estate (cf., *Estate of Ellis, supra,* 203 Cal. 414, 416; *Hogevoll* v. *Hogevoll, supra,* 59 Cal.App.2d 188, 193-194)—and with money furnished by Mr. Mitchell, some nine years after their marriage, so that the property thus acquired was a community asset. Admittedly the property was bought for and used as the family home for the Mitchells; the down payment on the property involved no cash advance by Mrs. Mitchell from her funds but only such amount—some $1,500—as constituted the differential in the refinancing of the existing mortgage—$3,500—through the escrow arranged for the handling of the increased encumbrance placed on the property by reason of the $5,000 loan and the deed of trust as security therefor; and the securities claimed to be the separate property of Mrs. Mitchell, and used in the purchase of the property, did not enter into the escrow. In view of these circumstances the trial court could reasonably have concluded that the proceeds of the loan, effected through Mrs. Mitchell's execution of the mentioned note and accompanying deed of trust and applied as part of the down payment, constituted community property, for such action was undertaken by her "during marriage" and the money did not appear to have been "borrowed by her upon the faith of existing separate property belonging to her." (*Moulton* v. *Moulton,* 182 Cal. 185, 189 [187 P. 421].) Moreover, the tes-

timony of both Mr. and Mrs. Mitchell, as above recited, with regard to the securities in question was vague and obscure in many respects—they differed as to the value, she fixing it as $1,200 and he at $2,000 at the time of the property purchase, and no documentary data was produced to support her claim of ownership although she expressly stated that there was "a record of what they were," and that the "various investments" were made "out of . . . money that [she] originally had that had been transferred, invested and re-invested" by her husband in connection with his investment business. Mr. Mitchell claimed that he searched for the company records but that they were nearly all lost in storage as the result of a fire. But in contradiction of the fundaments of the Mitchells' claim—that the source of the said securities was certain stock and cash owned by Mrs. Mitchell at the time of her marriage— there was the testimony of Mrs. Turner relating admissions made to her by Mrs. Mitchell to the effect that at the time of her marriage, Mrs. Mitchell took "everything she had to get ready for the wedding and her clothes," and that "she was stripped of everything." Furthermore, there was Mrs. Turner's positive statement that Mr. Mitchell had told her that "he never would hold anything in his own name any more [but] would put it in his wife's name." While Mr. Mitchell denied that such a conversation had ever taken place, "[t]he credibility of the witnesses and the weight of their testimony [were] committed for determination to the trier of facts." (*Security-First Nat. Bank* v. *Bruder, supra,* 44 Cal.App.2d 767, 771.) And Mr. Mitchell admitted that the family car was placed in his wife's name although he used it "approximately" all of the time, and she paid no consideration therefor, and already possessed a car of her own. As above related, Mr. Mitchell's indebtedness to Mrs. Turner was of many years' standing, and particularly evidenced by his first promissory note of $50,000 executed in 1934 and then subsequently twice renewed at four-year intervals. All of these latter considerations, in addition to the fact that Mr. Mitchell concededly had the "continued and exclusive management" of investments allegedly belonging to his wife and purportedly reinvested them for her from time to time (*Williamson* v. *Kinney, supra,* 52 Cal.App.2d 98, 102), would warrant the inference that Mr. Mitchell was placing community assets in the name of Mrs. Mitchell in an endeavor to protect them from the claims of his creditors; that for such purpose the Mitchells purchased se-

curities with community funds but placed them in Mrs. Mitchell's name; and that securities of such character in fact entered in 1937 into the down payment of the property here involved and motivated the entire financial arrangement, with title conveyance to Mrs. Mitchell, as a means of sequestering community assets. While Mrs. Mitchell testified that prior to the purchase of the property in 1937, she had received some desultory gifts of money from her parents at various times and had some slight earnings from her substitute teaching, all of which funds were deposited in her separate bank account, she likewise admitted that part of such account consisted of her savings from her "household allowance" from her husband's earnings. Such banking procedure would support the inference that any separate property that Mrs. Mitchell may have had was no longer so identifiable, but had become commingled with the community property of the parties and constituted a part of the community estate. (*Falk* v. *Falk*, 48 Cal.App.2d 762, 767 [120 P.2d 714]; *Buehler* v. *Buehler*, 73 Cal.App.2d 472, 474 [166 P.2d 608].) And the fact that Mr. Mitchell admittedly used community funds in making subsequent payments on the property here in question was another circumstance which the trial court might have viewed as indicating that though legal title was in the name of Mrs. Mitchell, the property actually represented a community asset rather than her separate estate. (Cf. *Truelsen* v. *Nelson, supra,* 42 Cal.App.2d 750, 753.)

The true situation in rebuttal of the presumption created by section 164 of the Civil Code, as to the separate character of property standing in the name of the wife, "can be shown by circumstantial, as well as direct, evidence and the inferences to be drawn from the evidence are for the trier of the facts to determine so long as those inferences find reasonable support in the evidence given." (*Williamson* v. *Kinney, supra,* 52 Cal.App.2d 98, 102.) As was said in *Estate of Kane,* 80 Cal.App.2d 256, at page 266 [181 P.2d 751]: ". . . findings on community property interest are invariably accepted if there is some evidence to sustain the finding," and "to prevail" against them, "appellant must show that there is no other inference, as a matter of law, than that the disputed . . . property was the separate property of [the wife]." From the foregoing review of the record, it is manifest that defendants have not made the showing required for successful chal-

lenge of the trial court's findings as to the community character of the property. Accordingly, such property was deemed liable for the satisfaction of Mr. Mitchell's debt (*Grolemund* v. *Cafferata,* 17 Cal.2d 679, 689 [111 P.2d 641]) as the premise for the trial court's disposition of this action in plaintiff's favor.

The appeal from the order denying the motion for a new trial is dismissed. The judgment is affirmed.

Gibson, C. J., Shenk, J., Carter, J., and Schauer, J., concurred.

Edmonds, J., and Traynor, J., concurred in the judgment.

Appellants' petition for a rehearing was denied October 18, 1948.