[Civ. No. 3764. Fourth Dist. Apr. 29, 1949.]

PRAIRIE OIL COMPANY (a Corporation), Appellant, v. FRANK E. CARLETON, Individually and as Trustee, etc., et al., Respondents.

John W. Preston and John W. Preston, Jr., for Appellant.

Siemon, Maas & Siemon for Respondents.

MUSSELL, J.—The complaint in this action in ejectment contains allegations that plaintiff is the owner and entitled to possession of certain real property in the county of Kern; that defendants are unlawfully in possession of the property and are withholding possession from plaintiff to its damage. Defendants' claim to possession of the premises is based on a lease dated April 17, 1941, whereby plaintiff leased the property for oil and gas purposes to defendant Frank E. Carleton, trustee, and on a writing called an operating agreement dated August 10, 1943, between Carleton and defendant Creasey pursuant to the terms of which Creasey took control of and operated the property. Plaintiff contends that defendants were in default in the performance of their obligations under the lease, and the defendants assert that the default, if any, was waived and excused by plaintiff.

The lease to Carleton contained the following drilling requirements:

"(a) On or before thirty (30) days Lessee must commence actual drilling in the ground on said land and must diligently prosecute the same without interruption, unless delay is excused as hereinafter provided, to a depth of not less than One Thousand (1000) feet, unless oil is found in paying quantities at a lesser depth.

"(b) Should further drilling of the first hole drilled hereunder become impossible by reason of accident, or unprofitable in the judgment of the Lessee, that hole may be abandoned.

"(c) Within ninety (90) days of the completion of the first well, or within thirty (30) days after abandonment of same as aforesaid, Lessee must commence the actual drilling of a new well and prosecute to the completion or abandonment in the same manner provided herein for the first well, and so on with each succeeding well until there shall have been drilled on said land nine (9) producing wells."

Paragraph 10 provides that: "The drilling and operating requirements of this lease shall be suspended while, but only as long as, Lessee is prevented from complying therewith, in whole or in part, by strikes, lockouts, war or inability (other than financial) of Lessee to obtain material or supplies, as well as delays in transportation, accidents and other matters of any kind or nature whatsoever beyond the control of Lessee, or when the price of oil falls below forty (40) cents per barrel at the well."

The lease provides for termination in the following language:

"11. In the event of a breach of any of the terms or conditions of this lease, by the Lessee, and failure by the Lessee to remedy the same within thirty (30) days after written notice from the Lessor so to do; then, at the option of the Lessor, this lease shall forthwith cease and determine and all rights of the Lessee in and to said premises be at an end:"

The provisions as to assignment or transfer and subletting the premises are thus stated:

"It is expressly understood and agreed that this lease shall not be assigned or transferred, nor shall the premises and rights covered thereby be leased, assigned or sub-let as to any portion thereof, without the written consent of the Lessor first being had and obtained."

By the terms of the so-called "Operating Agreement" of August 10, 1943, Carleton gave defendant Creasey the right to produce wells upon the property in question in accordance

with the terms of the lease of April 17, 1941, reserving in Carleton 24⅔ per cent of the first 500 barrels of oil produced in any one month, and 20⅔ per cent of oil production in excess thereof, Carleton to pay the royalty obligations to lessor under the lease. Creasey agreed ''to legally commence operations and to diligently prosecute the same and at all times strictly comply with all the terms and conditions of said lease.''

At the time of the execution of the lease to Carleton in 1941, three wells had been drilled on the property. These wells, numbered 1, 2 and 3, had been shut down and no oil had been produced from them for several years. From the date of the Carleton lease until the Creasey agreement, the property was operated by several parties under the Carleton lease. Well No. 3 was officially abandoned as no oil had been produced from it, and well No. 4 was drilled by one Hicks or by the Great Western Oil and Development Company. After Creasey took possession in 1943 he entered into a contract with the Standard Oil Company for the sale of oil, and in February, 1946, had completed the drilling of a new well on the leased premises which was known as No. 5. Creasey testified that in May of 1946, he had filed a notice to drill an additional well, No. 6, and had posted a bond; that about December 17, 1946, he spudded in that well but was unable to get casing, and on or about December 24, 1946, plaintiff served upon him a ''Notice of Default'' of the lease. The notice contained six grounds for default, summarized as follows:

''1. That drilling was not begun within 30 days following execution of lease;

''2. That if the operations actually conducted are claimed to constitute drilling, no additional well was commenced within 90 days of completion of first well;

''3. That operations were not carried on with due diligence and in good faith, and that the leased property has been used contrary to the lease by lessee and his assignee as a base for the treatment of road oils produced from other properties;

''4. That lessee and assignee failed to pay their portion of taxes;

''5. That lessee and assignee sold material taken from the leased premises, for which they failed to account to lessor-plaintiff; and

''6. That lessee assigned the lease and sub-let the premises without lessor's consent.''

The notice further provided that: "Unless you cure *all* of the above-mentioned defaults within thirty (30) days after receipt of this notice the undersigned lessor will terminate this lease as provided in Paragraph 11 of said lease." On February 24, 1947, plaintiff served upon the defendants a "Notice to Quit" and on March 12, 1947, filed the complaint herein.

It is quite apparent from the record before us that defendants failed to comply with the drilling requirements of the lease, as only two wells were drilled for a period of over five years, and the lease contract called for the drilling of not less than nine additional wells on the property. After the completion of the first well defendants were obligated to begin drilling within 90 days and to thereafter continuously conduct drilling operations until nine producing wells were completed.

Defendants assert that plaintiff waived strict performance of the terms of the lease and is estopped from declaring a forfeiture. In this connection there is evidence that George M. Brown, president and managing agent of plaintiff oil company, was thoroughly familiar with the property. He visited it many times and had many conversations with the operators prior to the Creasey agreement as well as with Creasey after he took possession in 1943. With full knowledge of the operations being conducted under the Carleton lease, Brown accepted, for the plaintiff, royalties from the production of oil from March, 1944, to and including December, 1946. The last shipment of 642 barrels in February, 1947, was not distributed. The statements called "run tickets" show that Creasey received about 80 per cent, Carleton 4 per cent and plaintiff 16 per cent of the production. The production reports made to the Division of Oil and Gas, indicate that in August of 1943, 48 barrels of oil per month were being produced from wells 2 and 4, while in 1946, production averaged 410 barrels per month from wells 2, 4 and 5.

Waiver is ordinarily a question of fact (*Lyons* v. *Brunswick-Balke etc. Co.*, 20 Cal.2d 579, 583 [127 P.2d 924, 141 A.L.R. 1173]) and a waiver of a legal right may be implied as well as express. (*Johnson* v. *Kaeser*, 196 Cal. 686, 698 [239 P. 324].) The acceptance of rents by the landlord after breach of the conditions of an oil lease, with full knowledge of all the facts, is a waiver of the breach and precludes the landlord from declaring a forfeiture of the lease by reason of the breach. (*Kern Sunset Oil Co.* v. *Good Roads Oil Co.*, 214 Cal. 435, 440 [6 P.2d 71, 80 A.L.R. 453].)

We conclude that plaintiff waived performance of the conditions of the lease requiring the commencement of drilling operations within 30 days after the execution of the lease, and also the provision requiring an additional well to be commenced within 90 days from the completion of the first, by acceptance of the royalties and benefits and by long acquiescence in the conduct of the defendants with respect to the development of the property. However, there was a continuing covenant to carry on drilling operations with due diligence until nine additional producing wells had been completed, and where such continuing covenants exist, the acceptance of the royalties would not constitute a waiver of future breaches of the lease. (*Extension Oil Co.* v. *Richfield Oil Corp.*, 52 Cal. App.2d 105, 108 [125 P.2d 895].)

Plaintiff then had the right to take the necessary steps to declare a forfeiture of the lease because of the failure of defendants to diligently prosecute drilling operations without interruption. The notice of default provided that defendants cure all defaults within 30 days after receipt of the notice, and, as we view the situation, defendants were required to resume drilling operations within that time unless other provisions of the lease excused performance of this condition.

Paragraph 10 of the lease provides that "the drilling and operating requirements of the lease shall be suspended while, but only so long as lessee is prevented from complying therewith, in whole or in part, . . . by inability (other than financial) of lessee to obtain material and supplies." Defendant Creasey testified that after spudding in well No. 6, in December of 1946, he was unable to get casing to continue drilling operations; that on December 19, 1946, he wrote to Carleton and sent a copy of the letter to plaintiff, in which letter he stated that he had contacted several supply houses in an effort to get casing and was unsuccessful and that he was suspending operations under the provisions of paragraph 10 of the lease. Creasey testified that he had tried to get casing "every place that I thought any pipe could be obtained"; that he made inquiry at 10 supply houses, and kept repeating his contacts to get pipe at intervals. Plaintiff produced witnesses who testified that they were able to buy casing during 1946.

The trial court found, on conflicting evidence, that during all of the year 1946 there was an acute scarcity of oil well casing and that only a small amount of second-hand casing was available, and then only in defective condition and at

irregular intervals; that on December 17, 1946, defendant Creasey was unable to secure the necessary oil well casing with which to continue drilling and suspended operations on account of such inability on or about December 19, 1946, and that on December 26, 1946, while defendant Creasey was still unable to secure the necessary casing he was served with the notice of forfeiture. The findings of the court thus made, cannot be disturbed here. (*Nichols* v. *Mitchell*, 32 Cal.2d 598, 606 [197 P.2d 550].)

Plaintiff contends, as a ground of forfeiture, that the lessee assigned the lease and sublet the premises without the lessor's consent. It is not necessary to decide whether the so-called "Operating Agreement" between Carleton and Creasey was an assignment or a sublease as there was only one such agreement, dated August 10, 1943. At about that time Creasey went into possession of the property and remained in possession to the exclusion of Carleton. Creasey operated the leased premises as he chose, subject only to the provisions of the Carleton lease. He shipped oil, drilled well No. 5, commenced well No. 6, and purchased casing and other materials for use on the premises. As plaintiff puts it—"He has, in short, exercised every right and power granted to the lessee in respect to every phase of drilling, producing and operating the leased premises."

There is a conflict in the evidence as to whether Brown, President of the plaintiff corporation, was aware of the terms of the operating agreement. Brown testified that in January, 1943, Creasey presented a document to him which he refused to sign on the ground that he considered it an assignment of the lease, and Creasey testified that he explained his position to Brown fully at the time. The court found that "at all times since August 10, 1943, plaintiff has had full and complete knowledge . . . of all operations carried on by defendants; that through the entire term of said lease plaintiff . . . has permitted, allowed and acquiesced in the operation of said property by defendant Creasey, and the manner in which and the time at which certain covenants of the lease have been performed without regard to the strict terms and provisions of the lease, and have accepted performance at certain times when performance was overdue without any objection." These findings are supported by substantial evidence and cannot be here disturbed.

Assuming that the operating agreement was a sublease, there is nothing in the record to indicate that the property was sub-

leased after Creasey took possession in 1943, and we conclude that there was a waiver of the terms of the lease as to the operations of Creasey under the agreement.

It is claimed that material was taken from the lease and sold in violation of the terms of the lease. The court found in this connection, on conflicting evidence, that certain equipment and materials were sold from the leased premises prior to August 10, 1943, which was of the reasonable value of $1,221, for which no payment was made to plaintiff as provided for in paragraph 10 of the lease, and gave judgment to plaintiff for that amount, to be paid within 10 days from the date of the interlocutory decree.

Plaintiff complains that by its interlocutory decree the court rewrote the contract of the parties to the lease. However, upon an examination of the terms of the decree it appears that the conditions imposed upon defendants were reasonable, and in any event were not prejudicial to plaintiff.

Judgment affirmed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied May 23, 1949, and appellant's petition for a hearing by the Supreme Court was denied June 27, 1949.