[Civ. No. 22246. Second Dist., Div. Two. Nov. 29, 1957.]

AURORA CHRISTINA SIEGER et al., as Executors, etc., Appellants, v. STANDARD OIL COMPANY OF CALIFORNIA (a Corporation) et al., Respondents.

Thomas F. McCue for Appellants.

Burr & Smith and Lawler, Felix & Hall for Respondents.

ASHBURN, J.—Appeal from judgment reforming a deed by correcting the description upon the ground of mutual mistake. The action was brought by W. Edward Sieger against Standard Oil Company of California, Paul W. McCollister and Charles McCollister, to quiet title to the disputed parcel of land, for declaratory relief and an accounting for rents. By cross-complaint the McCollisters sought reformation of the deed running to their predecessor in interest, Howard J. McCollister, and did so upon the ground of mutual mistake. The deed runs from George W. Carter and wife to Howard J. McCollister and his wife. Plaintiffs Aurora Christina Sieger, Edward Harold Sieger and Richard Joseph Sieger, claim the disputed parcel under a subsequent deed which the court found to have been obtained by their predecessor W. Edward Sieger from Carter without consideration and with notice of McCollister's equitable right to reformation.[1] Defendant and respondent, Standard Oil Company of California, is lessee in possession of the disputed premises.

The title chain starts with one Charles B. Stanford who owned an entire parcel situated on the northwest corner of the intersection of Atlantic Boulevard (running north and south) and Mission Road (which runs northeast and southwest), in the city of Alhambra; that property is part of Lot

---

[1]Plaintiffs are successors in interest to W. Edward Sieger, now deceased, and defendants McCollister are like successors to Howard J. McCollister and his wife, both of whom are now deceased.

As the wives of McCollister, Carter and others seem to have been but formal parties to respective instruments, the husband's name is frequently used herein to represent both spouses.

12, Range 15 of Alhambra Addition Tract, in the county of Los Angeles. The difficulty in descriptions, which are in terms of metes and bounds, seems to have arisen largely from the fact that Atlantic Boulevard was widened 20 feet on the west side, thus injecting into future conveyances uncertainty as to the proper starting point,—whether it should be the southeasterly corner of Lot 12 or the southeasterly corner of the portion left after the street widening.

As a matter of convenience the trial court designated as Parcels 1, 2 and 3 the different portions of the property originally belonging to Stanford. Parcel 1 is a parallelogram, being 105 feet along the southerly line of the lot and 94 feet along the easterly line; it begins at the southeast corner of the lot and includes the 20 feet of the original property which had become a part of Atlantic Boulevard, but excludes 20 feet on the west side which is the subject of this action and designated as Parcel 3. The exclusion of this 20 feet grew out of the mistake giving rise to the instant litigation. Parcel 2 embraces all of Parcel 1 except the easterly 20 feet lying within Atlantic Boulevard and also includes Parcel 3, the area here in litigation. Parcel 3 is shaped like a boomerang and lies on the north and west sides of Parcel 1, the property which plaintiffs concede to belong to the McCollisters, the area described in the original deed to McCollister; Parcel 3, due to the angle, is about 22 feet in width on the southerly line and five feet on the easterly line.

The Carters, Siegers and McCollisters, died before the trial of this action and the subject of mistake had to be canvassed through circumstantial proof. This fact seems to warrant the somewhat elaborate review of the evidence which follows.

On September 10, 1941, Stanford, the original owner, made a 10-year lease to Standard Oil Company of California for service station purposes. The description contained this language: *"Beginning at the southeasterly corner of said Lot 12,* thence westerly along the south line thereof, parallel to Mission Road a distance of 105 feet; thence northerly, parallel with Atlantic Boulevard a distance of 94 feet; thence easterly parallel with Mission Road a distance of 105 feet; thence southerly along the east line of said Lot 94 feet to the point of beginning, said property being the northwesterly corner of Atlantic Boulevard on Mission Road in Alhambra, California." (Emphasis added.) A memorandum of said lease was recorded on October 25, 1941. The lease provided that Stanford should construct the service station and that rents

should begin upon delivery of possession, which latter event occurred on November 15, 1941. A 20-foot street easement for Atlantic Boulevard had been granted by a prior owner, was recorded in February, 1941, and the street work completed prior to delivery of possession to the Standard Oil Company. The construction of the service station included black top asphalt paving of all of Parcel 2 (including Parcel 3); the installation of a 3-foot fence along the entire western and northern boundaries of Parcel 3; location of an electrolier in the southwest corner of that parcel; access ramps had been built upon the 20-foot strip which was a part of the improved street; the public curbs and sidewalk were in place on the service station side of the street. These physical evidences of the fact and nature of the possession by Standard Oil Company had never been altered prior to the trial of the case and Standard Oil Company had been in continuous possession at all times.

During the process of construction of the service station the parties to the lease executed an amendment thereto, changing the description to include Parcel 3 and exclude the 20-foot strip: "Beginning at the point of intersection of the *westerly line of Atlantic Boulevard, now established,* with the southeasterly line of said lot; thence southwesterly along the southeasterly line of said lot a distance of 105 feet; thence northerly, parallel with the westerly line of Atlantic Boulevard, 106 feet; thence easterly in a direct line to a point in the westerly line of said Atlantic Boulevard, a distance northerly thereon 96 feet from the point of beginning; thence southerly along said westerly line, 96 feet to the point of beginning." (Emphasis added.) This document was recorded on December 19, 1941. The westerly line of Atlantic Boulevard is 20 feet west of the easterly boundary of Lot 12. Such was the physical condition of the property and the state of the record title before Sieger or McCollister came upon the scene.

In 1941 Stanford conveyed all his interest in Parcels 1, 2 and 3 to one Eshelman, and assigned to him the lessor's interest in the lease. Eshelman in turn granted the same property and assigned the lease to George W. Carter in June, 1946. In that escrow Carter demanded a bill of sale covering electric hoist, air compressor, underground tanks and electroliers complete with flood lights and reflectors. He also advised the escrow holder, Security-First National Bank, that "we are selling property *covered by lease* through a concurrent escrow, Beverly Hills National Bank." (Emphasis add-

ed; the Carter-McCollister escrow was handled by the last named bank.) Also: "As you know, I am selling *the service station part* of this deal and wish to record, together with Escrow No. 15592-A at the Beverly Hills National Trust and Savings Bank, Beverly Hills. Will you please send to the Beverly Hills Escrow *the lease, assignment and bill of sale of the service Station.*" (Emphasis added.) Carter then gave Standard Oil an option to extend its lease until September 30, 1966, which option was executed on July 30, 1946 and recorded September 23, 1946; this document describes the land in the same way as the amended lease, thus including the disputed Parcel 3.

Clearly, Carter intended to sell the entire service station area and he was talking about his deal with McCollister which was handled through escrow in the Beverly Hills National Bank and opened on August 2, 1946. The description used in the deed to McCollister was obtained from the Pasadena branch of the Security-First National Bank (which handled the Eshelman-Carter escrow) and seems to have originated in a preliminary title report of Title Insurance & Trust Company. It was the erroneous one, beginning with the southeasterly corner of Lot 12 instead of the westerly line of Atlantic Boulevard. The assignment of lease from Carter to McCollister reflected the same mistake as to description. That this was an error is inferable from the fact that Carter, on September 17, 1946, wrote Eshelman that he had "*sold the Standard Oil Station* located at the corner of Mission Road and Atlantic Boulevard in Alhambra, *which I purchased from you,* to Mr. H. J. McCollister," (emphasis added) and asking him to notify Standard Oil "without delay to make payable all rent and overage checks" to McCollister. This Eshelman did on the same day. The Standard complied with the request and paid all rents to McCollister and his successors in interest and was doing so at the time of trial. The court found that Carter and McCollister at the time of the deed to the latter "mutually believed and considered that said grant deed, recorded August 7, 1946, correctly described Parcels 2 and 3 as described in Findings III and IV herein, respectively. The erroneous description in said grant deed, recorded August 7, 1946, was caused by the mutual mistake of the parties thereto. By said grant deed, recorded August 7, 1946, Carter intended to convey legal title to said Parcels 2 and 3 to Mr. and Mrs. McCollister, who intended to acquire the legal title to said Parcels 2 and 3 thereby."

W. Edward Sieger, by deed dated November 12, 1949, and recorded on November 25th, acquired from Carter for a consideration of $115,000 a portion of Lot 12 lying westerly of Parcel 2; the description excluded the land described in the McCollister deed and the 20 feet lying within Atlantic Boulevard; it did not embrace Parcel 3. On December 1, 1949, Carter deeded the last mentioned parcel to Sieger and the conveyance was recorded on December 19, 1949. The court found: "Said grant and conveyance, however, was without consideration, and was accepted by said W. Edward Sieger with full notice that said Parcel 3 and title and ownership thereof was and at all times thereafter has been and is now claimed by Mr. and Mrs. McCollister and their successors and occupied and used by Standard as Lessee and as tenant of Mr. and Mrs. McCollister and their successors under said Lease."

This later deed bears no revenue stamps. The only evidence as to any consideration for it was the opinion or guess of plaintiff Edward Harold Sieger (son of grantee) that it was all one deal; "that this actually should have been all part of one deed, instead of two separate deeds"; "[t]here must have been a mistake or Carter would not have given him another deed." The first the witness knew of any claim that his father asserted to Parcel 3 was after the death of the latter. He had begun this action on November 24, 1954 and died on December 11, 1954. The first knowledge that the McCollisters had of any such claim was a letter received by them from plaintiffs' attorney in July, 1954, which notice was also given at the same time to defendant Standard Oil Company; it contained a demand for past and future rents. Prior thereto all rents had been paid to McCollister—from September, 1946 until Sieger got his deed in 1949, and continuously thereafter until said demand of July, 1954—all without a word of complaint or demand from Sieger.

Of course, Sieger had at all times constructive notice of McCollister's claim of ownership of the entire area included within the oil station,—both through the recording of the amended lease and the physical occupation of the entire area by Standard Oil as tenant of McCollister.

On the basis of the mutual mistake found to have entered into the Carter-McCollister deed, the court ordered the reformation thereof by inserting the pertinent language above quoted from the amended lease; adjudged defendants McCollister to be owners in fee of Parcels 2 and 3; declared the

amended lease to be valid and the McCollisters entitled to rents and adjudged that the Siegers have no right to past or future rentals. The Siegers have appealed from this judgment.

Appellants' counsel argues that the evidence is insufficient to support the finding of mistake in the McCollister deed or the finding that Sieger's second deed was made without consideration and accepted with full notice of McCollister's rights; also that there was reversible error in the receipt of evidence of documents and conversations in and pertaining to the escrow through which McCollister acquired title and related escrows.

If W. Edward Sieger was a bona fide purchaser of the contested parcel, the admissibility of the evidence of which appellants complain becomes a matter of no importance for there could be no reformation affecting his rights. ■ Section 3399, Civil Code, provides for reformation because of mutual mistake of the parties to an instrument, but only ''so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value.'' The conjunctive used in the last phrase is expressive of the general common law on the subject. ■ To become a bona fide purchaser one must have acquired title without notice, actual or constructive, of another's rights and also must have paid value for the same. (25 Cal.Jur. § 268, p. 821, § 279, p. 829; 55 Am. Jur. § 685, p. 1066; 76 C.J.S. § 59, p. 410.)

In considering both aspects of the matter this court is bound by the substantive evidence rule; if the court's finding has such support in the record our inquiry as to alleged insufficiency of the evidence there ends. (*Nichols* v. *Mitchell,* 32 Cal.2d 598, 600 [197 P.2d 550] ; *Primm* v. *Primm,* 46 Cal. 2d 690, 693-694 [299 P.2d 231].)

Upon the subject of Sieger's notice of McCollister's equitable right the inquiry starts with the recorded instruments. ''Every conveyance of real property acknowledged or proved and certified and recorded as prescribed by law from the time it is filed with the recorder for record is constructive notice of the contents thereof to subsequent purchasers and mortgagees. . . .'' (Civ. Code, § 1213.) ■ ''A purchaser is charged with constructive notice of the existence and contents of all instruments properly of record, affecting the property purchased and constituting his chain of title, and is bound by grants, reservations, and recitals contained therein, if sufficiently clear and certain to convey the requisite information or to put him on inquiry, regardless of actual notice

or of the question whether the instrument imparting notice appeared in the abstract of title furnished him. . . ." (25 Cal.Jur. § 281, p. 832.)

Standard Oil Company was openly in possession of all of Parcel 2 and its lease was of record. The one originally recorded contained the erroneous description which crept into the deed to McCollister; in less than a month after its recordation an amendment to the lease was placed of record (on December 19, 1941), containing a corrected description which included Parcel 3. In 1946, prior to Sieger's purchase, there was recorded an option from Carter to Standard Oil to extend the lease for ten years from October 1, 1956, and the description therein used is that of the amendment to lease. The McCollister deed was made on August 2, 1946, and recorded on August 7th; this option was executed on July 30, 1946, and recorded on September 23d. ▮▮▮ The instruments were practically contemporaneous and the significance thereof lies in the rule that one whose search of the record would disclose a defective property description is charged with the duty of further investigation and with knowledge of whatever it would have disclosed. (*Leonard* v. *Osburn,* 169 Cal. 157, 161 [146 P. 530, 532].) Though the lease had been assigned by Carter to McCollister on August 2, 1946, that document was not of record. Sieger, had he examined the record, would have discovered that the description in the lease which corresponded to that in the McCollister deed had been corrected to include all property lying south and east of the Standard Oil fence, i.e., to include Parcel 3. He knew he was receiving no assignment of the lease and could expect none of the rents; investigation would have disclosed that McCollister claimed to be the owner of the lease and all land covered thereby and had been receiving all rents since 1946.

Another approach to the problem yields the same result. ▮▮▮ Possession of the disputed parcel by Standard Oil Company was notice of its title as lessee and of the title or claims of those under whom it held possession. (*Peasley* v. *McFadden,* 68 Cal. 611, 615 [10 P. 179]; *Manig* v. *Bachman,* 127 Cal.App.2d 216, 221 [273 P.2d 596]; *Whitney* v. *Sherman,* 178 Cal. 435, 439 [173 P. 931]; *Fowler* v. *Lane Mtg. Co.,* 58 Cal.App. 66, 69 [207 P. 919]; 25 Cal.Jur. § 282, p. 835.) Mere inquiry would have elicited the information that Standard Oil was holding under McCollister, that he claimed to be owner of all the land occupied by it and that all rents had been and were being paid to him. It cannot be held that

the evidence was insufficient to support the finding that Sieger acquired his title with notice of McCollister's equitable rights. ■ This ends his asserted status of innocent purchaser, but the finding that he paid no consideration for his second deed, the one including Parcel 3, is also sustained by substantial evidence.

The deed bears no internal revenue stamps and is covered by no direct evidence of the reason for its execution,—none other than the speculation of plaintiff, Edward Harold Sieger, to the effect that it must have been made to correct a mistake. It did not go through the escrow which handled the purchase. That it was not intended to correct a mistake on Sieger's part is evidenced by the fact that from its receipt in December, 1949, to July, 1954, when his attorney served a demand, Sieger voiced no claim to Parcel 3 or to the rents therefrom, and his son and executor never heard of such claim until after his death. Appellants herein are joint executors, as well as distributees of Mr. Sieger's estate. If consideration had been paid for the deed in question they probably could and would have produced a check or book entry to prove the fact; one of them testified that in his opinion Parcel 3 was worth $15,000 in August, 1955. The burden of proof rested upon plaintiffs to establish that Mr. Sieger paid value for the second deed. (*Beattie* v. *Crewdson,* 124 Cal. 577, 579 [57 P. 463]; *Huntington* v. *Donovan,* 183 Cal. 746, 751 [192 P. 543]; *Bell* v. *Pleasant,* 145 Cal. 410, 413-416 [78 P. 957, 104 Am.St.Rep. 61]; *Manig* v. *Bachman, supra,* 127 Cal.App.2d 216, 223; *Hall* v. *Chamberlain,* 31 Cal.2d 673, 676 [192 P.2d 759]; 76 C.J.S. § 82, p. 450.) In the absence of evidence the finding necessarily went against them.

Concerning the issue of mistake appellants argue that, although the evidence may show an intention on Carter's part to convey Parcel 3 to McCollister, there was no mutuality of mistake because it is not shown that McCollister intended to buy that part of Parcel 2. True, there is in the evidence no such specific declaration of McCollister but his conduct furnishes sufficient indirect evidence of his intention. ■ "[D]irect evidence of the manner in which a mistaken description became incorporated in a deed is not an indispensable requisite to a reformation thereof. If the circumstances proven are sufficient to induce the conviction in the mind of a reasonable man that there was a mutual mistake in drawing the deed and to show clearly in what such mistake consisted, a

reformation may be decreed although no witness testifies to personal knowledge of how it occurred." (*Owsley* v. *Matson,* 156 Cal. 401, 407 [104 P. 983].) McCollister immediately began and continued to collect the rents from the entire Standard Oil occupancy which of course included Parcel 3. In area it (3) constituted 31 per cent of the entire Standard Oil leasehold. It is not permissible to infer from the instant record that McCollister intended, without so stating, to buy only part of a property which was fully occupied by Standard Oil and fenced in so as to include the disputed parcel. Nor is it to be inferred that he was not cognizant of Carter's request to Eshelman to notify Standard Oil to pay all rents to McCollister, or that he was not instrumental in procuring the same. The evidence above reviewed adequately sustains the finding of mutual mistake inhering in the Carter-McCollister deed.

It now becomes necessary to determine whether there was prejudicial error in receiving the evidence of which appellants complain. The conclusion must be a negative. The transactions had in the respective escrows are not hearsay within the exclusionary rules. They are verbal acts of the parties involved, independently relative evidence of what they intended and of the manner in which the mistake occurred. (See *Roush* v. *Kirkman,* 42 Cal.App. 115, 118 [183 P. 353] ; *Lestrade* v. *Barth,* 19 Cal. 660, 674-675 ; 19 Cal.Jur.2d § 378, p. 109 ; 31 C.J.S. § 239, p. 988 ; 76 C.J.S. § 83, p. 451.)

Statements made by Carter, such as his letter saying that he was selling the Standard Oil parcel to McCollister, were admissible not only as part of the res gestae of mistake but also as acts or declarations of a deceased person done or made against his interest in respect to his real property. (See Code Civ. Proc., § 1870, subd. 4; *Horton* v. *Winbigler,* 175 Cal. 149, 157 [165 P. 423] ; also Code Civ. Proc., §§ 1849, 1853.)

There is no sound basis for disturbing the judgment ordering reformation of the deed in favor of the McCollisters. It follows that plaintiffs have no right to collect from defendant Standard Oil Company any rents, past or future, for they have been paid to the persons lawfully entitled thereto.

Judgment affirmed.

Fox, Acting P. J., and Richards, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.