ESTATE OF J. LESLIE VOGEL, ROBERT G. PARTRIDGE AND ELIZABETH S. VOGEL, EXECUTORS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57535. Filed April 28, 1958.

*Grant G. Calhoun, Esq.*, for the petitioner.
*Aaron S. Resnik, Esq.*, for the respondent.

The respondent determined a deficiency in Federal estate tax for the Estate of J. Leslie Vogel in the amount of $29,601.88.

---

Two basic issues are presented. The first, whether respondent properly included in decedent's gross estate as community property the assets standing in the name of decedent and in the name of Elizabeth Vogel.

The second issue is whether respondent correctly reduced a deduction for the allowance granted decedent's widow by the California court during the settlement of the estate from $1,500 per month to $1,000 per month.

Petitioners concede that $5,400 expended for maintenance and upkeep of a boat was not deductible as an administration expense.

The status of assets reported on the estate tax return as joint property was not put in issue by the pleadings.

FINDINGS OF FACT.

Some of the facts are stipulated, the stipulation being incorporated herein by this reference.

Decedent, J. Leslie Vogel, died August 16, 1950, a resident of California. A Federal estate tax return was filed on February 15, 1952, by the executors of his estate with the collector of internal revenue for the first district of California.

On January 15, 1934, the Les Vogel Chevrolet Company was incorporated to operate an automobile agency. The stock of the corporation was community property of J. Leslie Vogel (hereinafter referred to as decedent or Les Vogel), and his wife, Elizabeth S. Vogel (hereinafter sometimes referred to as Elizabeth Vogel or Elizabeth).

In 1942, decedent, in order to avoid the application of the excess profits tax, to admit his son, Les Vogel, Jr., into the business, and for other reasons, decided to dissolve the corporation and to form a limited partnership. The corporate minutes indicate that the assets of the corporation were transferred to decedent as of midnight, December 31, 1942. A resolution was written in 1942 looking to the dissolution of the corporation. The partnership agreement was executed on February 6, 1943, and named Elizabeth Vogel and Les Vogel, Jr., as limited partners, with decedent as a general partner for a term of 10 years from January 1, 1943, each having an equal share in the profits. The opening entries in the partnership ledger show the following capital accounts:

| | |
|---|---|
| Les Vogel | $33,147.71 |
| Les Vogel, Jr | 33,147.70 |
| Mrs. Les Vogel | 33,147.70 |

Separate drawing accounts were maintained for each partner. Income tax payments were charged to the respective drawing accounts. Other than income tax, the only charge to Elizabeth's drawing account was a monthly allowance of $100 and a monthly payment of $500 on

an F. H. A. loan on the family residence. Taxes on the residence were charged to decedent's drawing account.

On November 1, 1946, the business was again incorporated. The partnership balance sheet, as of October 31, 1946, filed with the application for incorporation, showed the following:

Accounts payable:
Les Vogel_____ $66, 083. 09
Elizabeth Vogel (Mrs. Vogel) _____ 73, 880. 64
Les Vogel, Jr._____ 37, 664. 26

177, 627. 99

Partners' capital:
Les Vogel_____ $32, 709. 22
Elizabeth Vogel_____ 32, 709. 20
Les Vogel, Jr_____ 32, 709. 20

98, 127. 62

The opening balance sheet for the corporation showed the following:

Capital stock_____ $150, 000. 00

Accounts payable:
Les Vogel and Elizabeth Vogel_____ $105, 382. 15
Les Vogel, Jr._____ 20, 373. 46

125, 755. 61

In order to provide a $50,000 payment by each partner for the stock issued, the amounts necessary to bring each of the partnership capital accounts up to $50,000 were taken from the accounts payable. One-third of the stock in the new corporation was issued to each of the former partners. Decedent and Elizabeth held theirs individually in their own names. The value of the capital stock was subsequently increased to $300,000 with 30,000 shares outstanding. At the time of decedent's death, decedent, Elizabeth, and Les Vogel, Jr., each held 10,000 shares.

Decedent and Elizabeth maintained two savings accounts in both their names, a savings account in the name of Elizabeth Vogel, and a checking account in the name of Les or Elizabeth Vogel.

Following the dissolution of the partnership the separate drawing accounts of decedent and Elizabeth were combined into one account on the books of the corporation. Various investments and personal expenses of decedent, along with other items, were charged against this account. With the exception of income tax, the only charge to the account specifically applicable to Elizabeth was a $3,000 gift to their son. A similar $3,000 gift to the son from the decedent was charged against the account on the same day. On October 31, 1947, the remaining balance was divided into two equal parts of $11,662.05.

One part was deposited in the savings account at the Marina Branch of the Bank of America in the name of Elizabeth Vogel. Some of decedent's salary checks were also deposited there. Later, these amounts were transferred to the checking account.

The other portion of the drawing account was deposited in the savings account in the name of Les or Elizabeth Vogel at the Polk-VanNess Branch of the Bank of America. It was subsequently withdrawn.

The principal deposits to the savings account in the name of J. Les and Elizabeth Vogel at Branch 253 of the Bank of America were salary checks of the decedent. Elizabeth made most of these deposits; it was her practice to retain $100 to $300 from the checks for household expenses and to deposit the balance. Transfers were made from this account to the checking account.

Not all salary checks were deposited in the savings accounts; a number were deposited in the checking account. Decedent made payments from the checking account for his own individual expenditures, for joint living expenses, and for investments in Elizabeth's name.

Decedent and Elizabeth maintained separate brokerage accounts, decedent's account being opened in 1946 and Elizabeth's in 1948. Purchases by decedent during 1946 and 1947 were charged to his partnership drawing account prior to the partnership dissolution on October 31, 1946, and to their drawing account on the corporation's books subsequent to that date. Investments in Elizabeth's brokerage account were paid for from the checking account.

Payment for 467 shares of Bank of America stock standing in Elizabeth Vogel's name was also made from the checking account.

In 1948 or 1949 the Leslie Financing Company was formed by Elizabeth Vogel, Les Vogel, Jr., and Dorothea Vogel. Each contributed $10,000 to the initial capital. Elizabeth obtained the necessary funds from previous investments.

About 1950 Elizabeth purchased a parcel of real property from Arthur M. Hardy, an old friend of the family. Hardy then designed and built the Anzavista Apartments on the property. All of Hardy's negotiations in the matter were with Elizabeth and the apartments were built for her. The record is inconclusive as to the source of the funds for the apartment venture.

During a conversation with an internal revenue agent after decedent's death, Elizabeth referred to the Anzavista property as decedent's. She further represented that whatever property she and decedent had belonged to both of them. At the trial Elizabeth referred to the Anzavista property as "the whole family's."

The tax returns of decedent and Elizabeth Vogel for 1940 and all

subsequent years were prepared by Lawrence H. Goebel, a certified public accountant. The information for these returns was mostly obtained from the office manager of the Les Vogel Chevrolet Company. Goebel reviewed the returns with the decedent, but could not recall discussing the nature of the property with him. Goebel assumed that the income from the various sources was community property, to be split accordingly.

Separate Federal returns were filed for the years 1946 and 1947, and joint returns for the years 1948, 1949, and 1950. Separate State returns were filed for the entire period 1946 through 1950. Historically, dividends were divided between decedent and Elizabeth Vogel. This was also true of dividends from stock registered in decedent's or Elizabeth Vogel's name, or both names jointly. It was true of capital gain or loss on the sale of such securities. The dividends from the Les Vogel Chevrolet Company were always divided equally between decedent and Elizabeth Vogel.

On the 1947 Federal return the capital gains on the sale of securities were described as community. On the 1947 State returns the total income reported was described as community.

Upon the advice of attorneys, decedent's and Elizabeth Vogel's dividends were segregated for the first time on the 1950 State tax returns filed after decedent's death.

Robert G. Partridge was decedent's personal attorney for approximately 15 years, beginning in the mid-1930's. Partridge and his associate, Wallace O'Connell, prepared two wills for decedent. The first will was executed December 13, 1946. The second was never signed.

The first will contained the following provisions:

FOURTH: All property in which at this time I have an interest or which stands in the name of myself or myself and my wife, either as tenants in common or as joint tenants, is community property. It is my intention to dispose not only of all property which I am entitled to dispose of by will, including my separate estate and my share of the community property, but of the entire community estate. If my wife, prior to the probate of this will, shall not have elected whether she shall take under this will or the rights given her by law, she shall in due course following my death, make such election. She shall, in any event, however, be entitled to exempt property and family allowance out of my estate.

Notes taken by Partridge during a discussion with decedent prior to the drafting of the first will included the words "transmutation agreement (Jan. 1, '43)." Partridge had had no independent knowledge on this subject and wrote down only what information decedent communicated to him. At no time during their discussions concerning the will did decedent show Partridge any written agreement which would have transmuted community to separate property.

Decedent and Partridge never discussed the transmutation of any property other than the Les Vogel Chevrolet Company.

The second, and unsigned, will was drafted for decedent in 1950. A draft of a proposed will for Elizabeth Vogel was prepared at approximately the same time. Both drafts refer to a written agreement converting their community property to separate property.

During discussions concerning the second will Partridge suggested to decedent that it would be best to have some expression of the transmutation agreement in writing. No agreement transmuting the property was ever prepared by Partridge or O'Connell and none was introduced in evidence, nor did any witness testify to the actual existence of such an agreement, either oral or written.

Partridge did not know in fact whether there ever was a transmutation.

At the time of decedent's death, decedent, Elizabeth Vogel, their son, Les Vogel, Jr., and their daughter Dorothea lived in a 3-story detached dwelling at 369 Marina Boulevard, San Francisco. Both Les, Jr., and Dorothea were over 21. The residence, located in a wealthy neighborhood, had been acquired in 1941 and was held in the name of Les Vogel and Elizabeth Vogel as joint tenants.

They employed a full-time maid and a gardener; the maid "lived in." Elizabeth also, on occasion, employed caterers; she entertained approximately once a month.

During his lifetime most of decedent's salary, which was about $1,800 a month, was expended in maintaining the home.

After decedent's death, Les Vogel, Jr., and Dorothea continued to occupy the house with their mother and a servant. Neither Les Vogel, Jr., nor Dorothea made any contribution to the maintenance of the home, either before or after decedent's death.

On September 7, 1950, Elizabeth Vogel filed a petition with the Superior Court of the State of California, San Francisco County, for a family allowance of $1,500 a month from the estate of J. Leslie Vogel. On September 19, 1950, the judge of the Superior Court entered an order granting the allowance. During the probate of the estate, checks totaling $27,000 were paid to Mrs. Vogel as a family allowance.

Decedent's will was admitted to probate and Elizabeth Vogel filed an election to take under its provisions on September 12, 1952.

A Federal estate tax return was filed on February 15, 1952. Various securities and miscellaneous assets were treated on the return as decedent's separate property. No reference was made to certain property standing in the name of Elizabeth Vogel alone. Deductions were claimed on the return for a bequest to surviving spouse (marital deduction) of $61,077.55 and an allowance for support of dependents

(family allowance) paid to Elizabeth Vogel totaling $27,000 ($1,500 per month for 18 months).

The respondent determined that the entire gross estate of decedent and Elizabeth Vogel was community property and recomputed the tax on a community property basis. The following assets standing in the name of Elizabeth Vogel were added to the gross estate:

| | |
|---|--:|
| 4 shares Pacific Turf Club stock | $1,700.00 |
| 500 shares Pacific Gas & Electric redeemable first preferred stock | 7,156.25 |
| 467 shares Bank of America stock | 6,333.69 |
| 217 shares Pacific Gas & Electric common stock | 3,499.13 |
| 250 shares Leslie Financing Company | 5,627.62 |
| Anzavista Apartments property | 8,800.00 |
| Savings account, Marina Branch of Bank of America | 1,181.74 |

Respondent decreased all expenses of administration, funeral expenses, and debts of the decedent by one-half, except $5,400 for maintenance and upkeep of a boat, which amount was totally disallowed. This disallowance of $5,400 is not contested by petitioners. The marital deduction was also disallowed. The family allowance was decreased from $1,500 per month for 18 months to $1,000 per month for the same period; one-half the total sum was permitted as a deduction. Respondent determined a deficiency of $29,601.88 in the return.

OPINION.

VAN FOSSAN, *Judge:* The first question is whether respondent correctly determined that all the assets standing in the name of decedent and all those standing in the name of Elizabeth Vogel were community property.

Petitioners contend that the community interest of decedent and Elizabeth in the Les Vogel Chevrolet Company was transmuted to separate property by oral agreement on January 1, 1943. Petitioners further contend that certain assets standing in the name of Elizabeth Vogel alone were purchased with income derived from her separate interest in the Chevrolet Company and thus were her separate property.[1]

In California, community property may be transmuted to separate property by oral agreement between the spouses.[2] *Tomaier* v. *Tomaier*,

[1] Cal. Civ. Code:

SEC. 162. Separate property; wife

SEPARATE PROPERTY OF THE WIFE. All property of the wife, owned by her before marriage, and that acquired afterwards by gift, bequest, devise, or descent, with the rents, issues, and profits thereof, is her separate property. The wife may, without the consent of her husband, convey her separate property.

[2] Cal. Civ. Code:

SEC. 158. Contracts with each other and third persons

HUSBAND AND WIFE MAY MAKE CONTRACTS. Either husband or wife may enter into any engagement or transaction with the other, or with any other person, respecting property, which either might if unmarried; subject, in transactions between themselves, to the general rule which control the actions of persons occupying confidential relations with each other, as defined by the Title on Trusts.

23 Cal. 2d 754, 146 P. 2d 905 (1944). It is not always necessary to show an express oral agreement; the status of the property may be demonstrated by the nature of the transaction or appear from the surrounding circumstances. *Long* v. *Long*, 88 Cal. App. 2d 544, 199 P. 2d 47 (1948). It should be noted, however, that property acquired by either the husband or the wife, or both, after marriage is presumed to be community property, and one asserting that such property is separate rather than community has the burden of establishing that fact.[3] *Wilson* v. *Wilson*, 76 Cal. App. 2d 119, 172 P. 2d 568 (1946).

There is a disputable presumption in California law that property acquired by a married woman by an instrument in writing is her separate property.[4] *Nichols* v. *Mitchell*, 32 Cal. 2d 598, 197 P. 2d 550 (1948). Petitioners, however, may not depend on this presumption alone to overcome the respondent's determination that the property in question is community. Cf. *Shea* v. *Commissioner*, 81 F. 2d 937 (C. A. 9, 1936), affirming 30 B. T. A. 1265.

Petitioners rely heavily upon the testimony of Robert G. Partridge, decedent's personal attorney for 15 years. Partridge and his associate, Wallace O'Connell, prepared two wills for decedent. The first was executed on December 13, 1946, and was admitted to probate following decedent's death. It provided, *inter alia*, that—

All property in which at this time I have an interest or which stands in the name of myself or myself and my wife, either as tenants in common or as joint tenants, is community property.

[3] Cal. Civ. Code:
SEC. 164. **Community property; presumptions as to property acquired by wife; limitation of actions**
All other property acquired after marriage by either husband or wife, or both, including real property situated in this State and personal property wherever situated, heretofore or hereafter acquired while domiciled elsewhere, which would not have been the separate property of either if acquired while domiciled in this State, is community property; but whenever any real or personal property, or any interest therein or encumbrance thereon, is acquired by a married woman by an instrument in writing, the presumption is that the same is her separate property, and if acquired by such married woman and any other person the presumption is that she takes the part acquired by her, as tenant in common, unless a different intention is expressed in the instrument; except, that when any of such property is acquired by husband and wife by an instrument in which they are described as husband and wife, unless a different intention is expressed in the instrument, the presumption is that such property is the community property of said husband and wife. The presumptions in this section mentioned are conclusive in favor of any person dealing in good faith and for a valuable consideration with such married woman or her legal representatives or successors in interest, and regardless of any change in her marital status after acquisition of said property.
In cases where a married woman has conveyed, or shall hereafter convey, real property which she acquired prior to May 19, 1889, the husband, or his heirs or assigns, of such married woman, shall be barred from commencing or maintaining any action to show that said real property was community property, or to recover said real property from and after one year from the filing for record in the recorder's office of such conveyances, respectively.
[4] Cal. Civ. Code, sec. 164, *supra*.

The second will was drafted for decedent in 1950. It was never signed. A draft of a will for Elizabeth was prepared at approximately the same time. Both refer to a written agreement transmuting community property to separate property, but no direct evidence of such a written agreement was introduced at the trial.

Notes taken by Partridge during a discussion with decedent prior to the drafting of the first will include the words "transmutation agreement (Jan. 1, 1943)." Partridge testified that he had no independent knowledge on this subject and wrote down only what information decedent communicated to him. At no time during these discussions did decedent show Partridge any written agreement which would have transmuted community to separate property.

Decedent and Partridge never discussed the transmutation of any property other than the Les Vogel Chevrolet Company.

Decedent was unable to explain to Partridge why Elizabeth's interest in the Chevrolet Company was her separate property. Partridge stated that he did not know in fact if there ever was a transmutation.

During discussions concerning the second will Partridge suggested to decedent that it would be best to have some expression of the transmutation agreement in writing. This was never done.

The specific language of the wills fails to support petitioners' argument. The first will does not refer to a transmutation agreement and states that all property standing in decedent's or in decedent's and Elizabeth's name is community property.

The draft of decedent's second will and the draft of Elizabeth's will both refer to a written transmutation agreement, but, as noted above, the existence of this writing has not been established. It can only be inferred that if such an agreement was contemplated it had not reached accomplishment at the time of decedent's death.

The fact that Elizabeth became a limited partner in the Les Vogel Chevrolet Company on February 6, 1943, and later, when the business was reincorporated, held one-third of the stock in her own name does not establish that her interest was separate property.

In *George W. Van Vorst*, 7 T. C. 826 (1946), a California case in which both husband and wife were among the partners in an enterprise, this Court, after surveying the law, concluded (p. 830):

that if any part of the capital investment of the petitioner [husband] in the partnership was previously community property, it was not transmuted into his separate property by virtue of the partnership agreement.

Naked legal title is of little value in determining whether property is community or separate. *Tomaier* v. *Tomaier, supra.*

Assuming that an agreement transmuting community to separate property had been arrived at, its existence would, of necessity, have been within the knowledge of Elizabeth Vogel. Although she testified at length for the petitioners, she was at no time asked whether a transmutation agreement had ever been discussed by her and her husband, or if such existed.

It is well established that failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. *Wichita Terminal Elevator Co.*, 6 T. C. 1158, affd. 162 F. 2d 513 (C. A. 10, 1946). This is especially true when the party failing to produce the evidence has the burden of proof. *Wichita Terminal Elevator Co., supra.*

After considering all the evidence we are convinced that petitioners have not sustained their burden of proof and have failed to show that a transmutation took place.

Petitioners concede on brief that originally all the property owned by decedent and Elizabeth Vogel was community property. Since we have concluded that petitioners have failed to show a transmutation from community to separate property, all the assets standing in the name of decedent or in the name of Elizabeth Vogel, including the Chevrolet property, must be regarded as community property. The pleadings raise no issue as to the jointly held property, nor does petitioner raise any issue as to respondent's adjustments of administration expenses and similar expenditures, excepting the family allowance as to the widow.

We hold that respondent correctly determined that the entire gross estate of decedent and Elizabeth Vogel was community property.

The last question is whether decedent's estate is entitled to a deduction for family allowance of $1,500 per month for the support of decedent's widow, or $1,000 per month, as determined by the respondent.

Pursuant to section 812 (b) (5) of the Internal Revenue Code of 1939, an estate may deduct such amounts as—

reasonably required and actually expended for the support during the settlement of the estate of those dependent upon the decedent, as are allowed by the laws of the jurisdiction * * * under which the estate is being administered * * *

Regulations 105, section 81.40, provides that the support of dependents of the decedent during the settlement of the estate is deductible but pursuant to the following rules:

(a) In order to be deductible, the allowance must be authorized by the laws of the jurisdiction in which the estate is being administered, and not in excess of what is reasonably required.

(*b*) The allowance for which deduction may be made is limited to support during the settlement of the estate. Any allowance for a more extended period is not deductible.

(*c*) There must be an actual disbursement from the estate to the dependents, but after payment has been made the right of deduction is not affected by the fact that the dependents do not expend the entire amount for their support during the settlement of the estate.

California grants "such reasonable allowance" to the widow during the settlement of the estate as should be necessary for her maintenance according to her circumstances. Under the California statute, included with the widow were the minor children, if any. The law was changed recently by adding to the family, adult children who have been declared incompetent by the court. The two children of decedent who lived in the family home both before and during the settlement of the estate and made no contribution thereto were adults and had not been declared incompetent. Thus it is that the two children were excluded and the family allowance was exclusively for the support of the widow.

The decedent, according to the record, spent most of his monthly salary of $1,800 in maintaining the home, but it should be remembered that he provided maintenance for four persons, namely, himself, his wife, and two adult children, while the allowance during the settlement of the estate was for the support of the widow only. If decedent was able to provide maintenance for the family of four in the home for less than $1,800 per month, it would seem to follow that respondent's allowance of $1,000 per month for maintenance of the widow alone was adequate and reasonable for her support and this in the manner and style previously obtaining. We have very little evidence of the actual cost of maintaining the home, either before or during the settlement of the estate. Suffice it to say, petitioner has not demonstrated or proved that respondent's allowance was inadequate.

*Decision will be entered under Rule 50.*