Filed 9/1/20  Marriage of MacDonald CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# COURT OF APPEAL, FOURTH APPELLATE DISTRICT

# DIVISION ONE

# STATE OF CALIFORNIA

In re the Marriage of RICHARD MACDONALD and KILEY MACDONALD.

RICHARD MACDONALD,

    Respondent,

    v.

KILEY MACDONALD,

    Appellant.

D076363

(Super. Ct. No. D556654)

APPEAL from a judgment of the Superior Court of San Diego County, Truc T. Do, Judge.  Reversed in part; affirmed in part; remanded with directions.

Bickford Blado & Botros and Andrew J. Botros for Appellant.

Richard MacDonald, in pro. per. for Respondent.

While Kiley and Richard MacDonald were married, Richard's mother, Beverly Greer, loaned the couple a total of $200,000 so they could make home

improvements and pay off other higher interest loans. The loan required Kiley and Richard to make monthly payments of $1,000, but they were permitted to prepay on the loan without penalty. Greer also agreed to defer all interest on the loan until the principal was paid in full. However, if Greer were to pass away before the loan's principal was paid off, the interest would be forgiven.

Kiley and Richard began paying on the loan in March 2007. They made the $1,000 monthly payments until December 2012 when they began to pay $2,500 per month. Yet, after making 13 payments of $2,500, Kiley and Richard missed their first loan payment, and payments thereafter were sporadic. After the loan payments became intermittent, Kiley and Richard separated. The couple was headed for divorce.

As part of the divorce proceedings, Kiley and Richard sold their community home. At that time, Greer was willing to allow Kiley and Richard to satisfy the loan on very generous terms. If they paid Greer the outstanding principal in full, Greer would forgive all the deferred interest that would be due under the loan. Unfortunately, Kiley and Richard could not agree regarding what each of them owed to pay off the principal, and the loan's principal was not paid. Yet, Greer remained willing to allow Kiley and Richard to pay off the loan on favorable terms, no longer forgiving all the interest but still foregoing a substantial amount of interest if Kiley and Richard agreed to pay off the loan in one lump sum. Kiley and Richard did not do so.

Instead, Kiley and Richard stipulated to referring the loan and other property issues to a referee appointed under Code of Civil Procedure section 638. Over several objections by Kiley, the referee ultimately issued a statement of decision that decreed the parties had modified monthly

payments under the loan to $2,500, and, based on those payments, the principal of the loan should have been paid off before Kiley and Richard sold the community home. As such, all the deferred interest under the loan would have been due then. The referee determined that Kiley and Richard owed Greer a total of $126,793.65 (as to the principal and interest of the loan only) with Kiley owing $67,737.91 (including additional legal interest beyond the principal and interest under the loan) and Richard owing $63,396.83. The referee further determined that the payments should be made from a trust account held by Kiley's attorney wherein the proceeds of the sale of the community home were deposited. The superior court issued a judgment, incorporating the referee's statement of decision. As relevant here, the court's judgment required Kiley and Richard to pay off the loan per the referee's statement of decision within seven days of the filing of the judgment.

Kiley appeals that judgment. While her appeal was pending, she applied ex parte for an order canceling the check in the amount of $67,737.91 taken from the trust account that was to be paid to Greer to satisfy Kiley's obligation under the loan. She did not seek to cancel the check taken from the trust in the amount of $63,396.83 on behalf of Richard. The court granted Kiley's application allowing a stop payment to be issued on the check.

However, while this matter was pending with the referee, Richard continued to make payments on the loan. After receipt of Richard's $63,396.83 payment, Greer represented that all principal on the loan had been paid at least as of August 6, 2019. As such, under the loan's terms, the deferred interest has been due since that date.

In the instant matter, Kiley argues the judgment as to the loan from Greer must be reversed. To this end, she argues substantial evidence does

3

not support the referee's determination that the monthly payment amount was modified to $2,500. She also claims the referee improperly interpreted the note evidencing the loan as well as Civil Code section 3302. She maintains that reversal of the judgment would undo Richard's payment to Greer on the loan, and after a return to the parties to their respective pre-appeal circumstances, the court can order the parties to resume making monthly payments of $1,000 with Kiley and Richard each contributing $500.

We agree with Kiley that substantial evidence does not support the referee's finding that monthly payments had been modified to $2,500. As this was a key finding that led the referee to conclude that the entire principal under the loan was due before Kiley and Richard sold the community home, we must reverse the judgment in part. However, we disagree with Kiley that a reversal would somehow undue the $63,396.83 payment Richard made to Greer from the trust over a year ago. Greer is not a party in this matter, and neither this court nor the superior court has jurisdiction to order Greer to take any action, including returning money she was paid under the loan. Further, we disagree that after reversal, Kiley can simply amend the pleadings to add Greer as a party so the court can order her to return the $63,396.83 payment. It is undisputed that Greer was entitled to the principal under the loan. Through no fault of her own, she received Richard's payment over a year ago. Kiley made no effort to prevent Richard from making the subject payment after the court issued the subject judgment. As such, it would be unfair to require Greer to return Richard's payment after so much time has transpired.

Consequently, although we reverse and remand this matter, what is left for the superior court to decide is very narrow. Upon remand, the superior court is to determine when the principal of the loan was paid in full

4

and calculate the amount of interest due based upon that date. Moreover, the court is to determine Kiley's and Richard's respective obligations to pay the amount due to Greer while considering the applicable law as well as equity and fairness as the situation requires. In all other respects, the judgment is affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

The superior court entered a judgment of dissolution as to Kiley and Richard's marriage on August 21, 2018. The judgment resolved the issues of marital status, child support, spousal support, and attorney fees. The judgment did not address property division. No party appeals the judgment dissolving the marriage.

On March 19, 2018, two days before trial on the dissolution issue, the trial court entered an order and stipulation regarding various property issues. The stipulation included an appointment to a referee under California Code of Civil Procedure section 638 to resolve nine issues related to the division of certain property and debt.[1] One of those issues was "[d]etermining the character, balance owed and allocation of the funds loaned by [Richard's] Mother and issuing the decision as to the amount owed by each party." Here, Kiley only challenges the referee's findings as to this loan. As such, we eschew any discussion of the other eight issues sent to the referee for resolution.

The promissory note, dated February 7, 2007, evidencing the loan indicates that Greer loaned a total of $200,000 to Richard and Kiley (together

---

[1]     Although Code of Civil Procedure section 638 only mentions a referee, throughout the briefs and the record, the parties state that the dispute was sent to a special master. While this semantic difference is unimportant, for purposes of our opinion, we refer to a referee as that term is consistent with the statute.

5

referred to as MacDonald in the note) consisting of a $100,000 loan made on August 7, 2006, and a $100,000 loan made on February 7, 2007. The note required the loan to be repaid beginning March 7, 2007, with Richard and Kiley making monthly payments of $1,000. Further, the note provided: "*Upon mutual agreement* between [Greer] and MacDonald, the Fixed Monthly Installment of Principal may be increased or decreased. MacDonald has the right to prepay this Note either in full or any part thereof at any time."

Under the note, the loan would accrue interest at a specified rate, but the interest would be deferred until the loan principal was paid in full. Upon payment of the principal balance, the interest would "be due and payable in full." However, Greer could agree to monthly payments of the interest if she was so inclined. If Greer predeceased the payoff of the principal, the note stated that the amount owed on the principal would be deducted from any inheritance due Richard or his heirs, and the unpaid, accrued interest would be cancelled. Greer, Richard, and Kiley signed the note.

Accompanying the note was a document entitled "Intent of Loan." It stated as follows:

> "Provide a loan of $200,000 to Rick & Kiley to enable them to finish work on their new home and payoff [*sic*] higher-interest loans they may have.
>
> "Provide documentation of the Loan.
>
> "Defer interest payments until principal is paid in order to: (1) Provide cash flow to Mom, (2) Reduce or eliminate interest in case of Mom's death.
>
> "Give Mom ability to have payments or interest increased should her financial situation require it.
>
> "Provide Rick & Kiley option to prepay principal and interest without penalty.

6

> "Provide documentation that the amount of the unpaid principal balance of the loan would be deducted from Rick's (and his heir's) portion of inheritance in case of Mom's death in order to keep inheritances fair and equitable."

The note was modified by a second note dated June 1, 2012. The second note only modified the interest rate. Under the modified note, there was to be no interest for the first year of the loan. After the first year, the interest rate would be 5 percent per annum until May 31, 2012 and then four and a half percent beginning on June 1, 2012. All other terms of the loan remained unchanged.

The referee held an initial meeting with the parties. After that meeting, the referee summarized the issues regarding the loan as follows:

> "During the marriage, the parties borrowed about $200,000 from [Richard's] mother. I understand this loan was secured by a note and may represent a lien against the house sale proceeds currently held in trust.[2]

> "[Kiley] acknowledges the debt but believes the amount claimed includes an additional $10,000 loan taken by [Richard] after separation and interest she believes the mother waived. Also, [Kiley] argues that [Richard] had previously agreed to take the debt as part of the divorce.

> "[Richard] agrees that the current balance includes a $10,000 loan he took after separation, and that his mother was willing at one time to waive interest but given [Kiley's]

---

2    The parties entered into a Stipulation and Order Re: Disposition of Proceeds of Sale of Family Residence. Per the stipulation, each party was to receive 25 percent of the net proceeds of the sale (about $115,788.25), and the remaining balance of the net proceeds (about $231,560.50) was deposited into an attorney-client trust account held by Kiley's counsel, pending further agreement or order of the superior court. The court reserved jurisdiction over all executory issues related to the disposition of these sale proceeds.

7

> refusal to cooperate with repayment once the family home was sold, she wants interest included."

The referee requested that the parties produce a copy of the original note or loan agreement, documents showing any additional funds Richard borrowed after the date of separation, documents evidencing payments and the amount due on the loan, and any "letters, emails, texts, etc. regarding this loan."

The parties submitted various documents for the referee's review.[3] Most of the documents Kiley produced concerned her efforts to settle the dispute regarding the loan. For example, on or about February 1, 2018, Kiley sent Greer a check for $36,000 and a release as to Kiley's obligations under the loan. Greer rejected the offer because she believed the amount Kiley offered did not accurately reflect what Kiley owed on the loan. Although Greer made multiple settlement demands, some of which included waiving all interest due under the loan, it appears that she and Kiley were not able to agree on the amount Kiley owed on the loan.[4]

---

[3]    Apparently, the referee did not take any sworn testimony.

[4]    For example, in a letter dated June 26, 2017, Greer demanded the parties pay the remaining principal balance of the loan ($79,000) from escrow of the future sale of the community home. If the parties did so, Greer was willing to waive all interest due upon payment in full of the principal. In correspondence dated July 3, 2017, Greer reiterated this demand. The parties did not pay off the loan from the escrow of the sale of the community home. On August 18, 2017, Greer demanded Richard and Kiley each pay $39,500 to settle the matter. They did not do so. On February 1, 2018, Greer advised Richard and Kiley that she was willing to settle the dispute over the loan if each party paid her $49,500. Five days later, Greer stated her previous settlement demand had expired and that she would be seeking the full amount of the loan, including interest.

In the documents Kiley produced to the referee, she also represented that Richard handled "all of the finances" during the marriage, including the loan; thus, Kiley did not have a lot of financial information about the loan. In fact, it appears that she found out about what was paid on the loan and what was owed on the loan during the discovery process in the dissolution action.

Among the documents Richard provided the referee was a spreadsheet detailing the payment history of the loan.[5] Based on that spreadsheet, payments of $1,000 on the loan commenced in March 2007. Such payments continued through November 2012. In December 2012, payments in the amount of $2,500 were made on the loan. These increased payments continued through December 2013.

The first missed payment on the loan occurred in January 2014, which was followed by an additional four months of missed payments. Then loan payments became very sporadic. The following payments were made over the next several months: a payment of $15,000 in June 2014, a payment of $7,500 in January 2015, a payment of $1,000 on September 3, 2015, a payment of $1,000 on September 30, 2015, and a payment of $1,000 on October 30, 2015. Also, it appears that an additional $10,000 was borrowed in April 2015. In addition, according to the payment spreadsheet, Greer waived $20,829 of accrued interest under the loan.

Like the documents provided by Kiley, many of the documents provided by Richard showed his efforts to resolve the dispute over the loan. However, unlike Kiley, it appears he was willing to settle the dispute under the terms proposed by Greer. For example, he asked the escrow officer involved with

---

[5] There is no indication in the record that any party refuted the accuracy of the information contained in the payment spreadsheet produced by Richard.

the sale of the community home to include a $79,000 payoff to Greer for the loan. In doing so, Richard indicated that Kiley might not agree to the payoff. After the loan was not paid off through escrow, Richard applied ex parte for an order that $49,500 be paid from the trust account holding the proceeds of the sale of the community home in attempt to pay his share of a settlement demand from Greer. Kiley opposed the ex parte application, and the court denied Richard's request.

Therefore, based on the record before us, it is abundantly clear that Greer attempted multiple times to settle the dispute over the loan. She even was willing to forgive all the deferred interest. Nonetheless, the parties could not agree on the amount owed, and settlement discussions proved fruitless. As such, the referee was tasked with resolving this dispute.

On October 22, 2018, the referee produced his initial report. Regarding the loan, the referee considered the documents before him and made certain "recommendations as to the rights between the parties." The referee found that the loan "was clearly a community debt." The referee recommended that Kiley owed Richard $7,520 for payments he made after the date of separation. The referee further found that the community owed Greer $128,863.49 under the loan. The referee stated "[w]hether this attaches to the house sale proceeds is a question of fact for the Court; however, it is the [referee's] recommendation that this money be paid from the house sale proceeds to allow this issue to be resolved now and to avoid future entanglements between the community and a family member." The referee also found that whether Kiley should be solely responsible for interest accruing after close of escrow or date of settlement offer rejection is a question of fact for the court.

In explaining his recommendations, the referee clarified that "[t]he marital payments schedule provided by [Richard] shows that the loan payments increased from $1,000 to $2,500 in December 2012. However, it is not clear if this was the result of a formal agreement; and no supporting contracts, emails, or other documents have been produced on this specific issue." Nonetheless, the referee considered the monthly payment amount modified, and based on the increase to $2,500, he determined that the loan should have been paid off a few months before the community house was sold, making all interest due at that time. Accordingly, under Civil Code section 3302, the referee stated that Greer was entitled to the amount due under the loan plus interest, which would include the unpaid principal, interest under the note, and legal interest on the total unpaid amount.

The referee explicitly rejected Kiley's request to bring the loan current (by assuming a $1,000 monthly payment) and then order the parties to each pay $500 a month going forward until the principal was paid in full. The referee further illuminated:

> "Also, any proposition that repayment be drawn out for an extra six years to possibly take advantage of a contract provision to terminate accrued interest upon the mother's death does not appear equitable. The stated intent of the loan interest was to provide cash flow to the mother while she is alive, and I believe the interest waiver provision was actually intended as a probate avoidance tool which implicitly assumed the parties' continued marriage.
>
> "As a practical matter, [Kiley's] position would require that [Richard's] elderly mother be tied into an agreement for more than five years into the future with a former daughter-in-law, with potential for further disputes and collection efforts against the former community, especially once the large interest balloon payment becomes due. Resolution of this note issue should be finalized as part of this divorce proceeding."

11

Kiley submitted a response to the referee's report. Kiley conceded that the loan was community debt. However, Kiley disagreed with several of the referee's findings. She claimed the loan was not in default at the date of separation. She also asserted that there was nothing in the terms of the loan that required it to be paid off upon the sale of the community home. Kiley maintained that the amount the referee calculated improperly included an additional $10,000 Richard had borrowed after the date of separation. Finally, Kiley insisted that she should only reimburse Richard $2,000, representing half of the $4,000 Richard paid on the loan after he began making support payments to her on June 1, 2016.

After some squabbling by the parties regarding whether the referee could reconsider his report, what additional information the referee could consider, and the timing of the submission of such information, Richard submitted a response to the referee's report. In that response, Richard asked the referee to consider his claims of breach of fiduciary duty against Kiley as to the loan. Richard also represented that the amount owed on the loan would have to be adjusted because he had "been continuously making $500.00 payments beyond the date of [the referee's] initial report." Richard emphasized his belief that Kiley had been acting in bad faith regarding repaying the loan and urged the referee to confirm that the loan be satisfied from the proceeds of the sale of the community home held in trust.

After considering the arguments and additional information produced by the parties, the referee issued a supplemental report. The referee rejected all of Kiley's arguments, asserting that Family Code section 2622 allowed the court to order community debt incurred before the date of separation be paid from existing funds held in trust. The referee further explained that whether the loan was secured by the community house did not limit the court's

12

jurisdiction over its payment or allocation. According to the referee, "[t]his was clearly a family loan, and [Richard] has reason to believe-based on [Kiley's] past history and arguments-that if it is not paid as part of the Court's order on the issues for this hearing, the result will be additional litigation and costs[,] which may extend beyond the life of the lender mother-in-law."

After the referee released his supplemental report, a dispute arose as to whether the referee's report and recommendations would be considered a binding decision. At an ex parte hearing, the superior court determined that the parties' stipulation and order filed on March 19, 2018 was for a binding decision, and the referee was to prepare a statement of decision. The referee therefore submitted a statement of decision on June 13, 2019. In the statement of decision, the referee found that Richard and Kiley owed Greer $126,793.65 (which included principal and interest) as of January 30, 2018. The referee split the amount owed equally between the parties ($63,396.83), but concluded Kiley was responsible for an additional $4,341.08 in interest from January 31, 2018 to June 25, 2019. The referee decreed: "This money shall be paid directly from the house sale proceeds held in trust to allow this issue to be resolved consistent with the loan agreement, and to avoid future entanglements between the community and a family member."

Kiley objected to the statement of decision, contending: (1) there was no "triggering event under the terms of the promissory note" that would cause the balance under the loan to be due; (2) the parties should be ordered to pay $500 a month each until the remaining principal has been paid in full; and (3) the court had no jurisdiction over Greer and any decision by the referee "is of no force or effect with respect to the satisfaction" of the loan without a joinder of Greer.

13

The referee denied Kiley's objections to the statement of decision. Incorporating the referee's statement of decision, the superior court issued judgment on the remaining property issues, including the loan. As to the loan, the court concluded Greer was to receive a check paid out of funds held in trust for the amount of $131,134.74, with Richard paying $63,396.83 and Kiley paying $67,737.91.

Kiley appealed the judgment. She also applied ex parte to stop payment on the check made on her behalf to Greer in the amount of $67,737.91 and then obtain a check in the same amount to be deposited with the superior court to stay the judgment pending appeal. The court granted the ex parte application on the terms requested by Kiley, including staying the judgment "no longer than August 12, 2019 for the purpose of [Kiley]" canceling her payment to Greer and depositing that amount with the superior court.

Nonetheless, nothing in the order on Kiley's ex parte application stopped Richard from sending his $63,396.83 check to Greer. Greer received that check, deposited it, and applied it to the loan. Consequently, Greer sent a letter to Kiley and Richard, indicating the principal of the loan had been paid in full sometime before August 6, 2019.[6] Greer indicated that all interest under the loan was thus due and demanded Kiley send her $67,737.91 as determined by the referee.

---

[6] Apparently, Richard continued to make payments on the loan while the matter was pending with the referee. He paid a total of $8,500. In a letter by Greer dated August 6, 2019, she represents that those payments combined with the $63,396.83 paid by Richard out of the trust satisfied the outstanding principal under the loan.

14

Richard then applied ex parte for an order to require Kiley to pay Greer in the amount of $67,737.91 because, under terms of the loan, the deferred interest was due. The superior court denied the application.

DISCUSSION

Kiley challenges the judgment as to the loan in three primary ways. First, she claims the referee improperly interpreted the note to: (1) include an acceleration clause and (2) be tied to the sale of the community home. She insists the note merely requires that Kiley and Richard make monthly payments of $1,000 until the loan's principal is paid in full. Thus, there is nothing in the note that would allow the referee to require the loan to be paid in full when the community house was sold. Second, she contends the referee misinterpreted Civil Code section 3302 to accelerate the entire amount due under the loan after finding the loan was in default. Finally, she claims substantial evidence does not support the referee's finding that the monthly payments were modified from $1,000 to $2,500.

In challenging the referee's findings about the loan, Kiley somewhat obscures the reasoning of the referee's determination that the outstanding principal was due on the loan before the community home was sold. She claims the referee read terms into the note that did not exist. Specifically, Kiley insists the referee "relied on the interpretation of Civil Code section 3302 and the language of the promissory note in determining that the note should be accelerated." Yet, this characterization of the referee's reasoning is not consistent with the findings contained in the referee's original report. These same findings were incorporated and referenced in the statement of decision on which the subject judgment relies.

In the referee's initial report, he found that the loan payments increased from $1,000 to $2,500. Based upon monthly payments of $2,500,

15

the referee determined that Kiley and Richard would have paid off the loan's principal before the community house was sold if they made all the required payments. At that point, the deferred interest under the loan would have been due and owing in full. He then observed that under Civil Code section 3302, Greer would be entitled to the amount due under the loan plus interest. Accordingly, simply reviewing the referee's reasoning in his initial report, it does not appear the referee read any terms into the note or otherwise misinterpreted Civil Code section 3302.[7]

Similarly, we read nothing in the referee's supplemental report or statement of decision that alters the reasoning set forth in his original report. At most, some confusion might arise from the referee's written ruling on objections to the statement of decision. There, the referee pointed out that the "law and facts" he relied on were contained in his initial report. However, he then explained, "the debt had fallen into default for lack of payment, the entire amount became due under Civil Code §3302, and the court has authority to divide the debt under Family Code §2620." The referee's summary is inconsistent with the "law and facts" he references in his initial report. The essential findings as reflected in the referee's initial report were that the monthly payments were modified to $2,500, and based on that monthly payment, the entire principal of the loan became due before the community home was sold. There is no indication in the referee's initial report, the supplemental report, or the statement of decision that the referee simply stated the loan was in default and could be accelerated under Civil

---

[7] Civil Code section 3302 provides: "The detriment caused by the breach of an obligation to pay money only, is deemed to be the amount due by the terms of the obligation, with interest thereon."

16

Code section 3302.[8]  Accordingly, the critical issue before us is whether the referee's finding that the monthly payments were modified to $2,500 is supported by substantial evidence.

In applying the standard of review of substantial evidence, we imply all necessary findings supported by substantial evidence (*Berman v. Health Net* (2000) 80 Cal.App.4th 1359, 1364; *Sobremonte v. Superior Court* (1998) 61 Cal.App.4th 980, 992) and "construe any reasonable inference in the manner most favorable to the judgment, resolving all ambiguities to support an affirmance" (*Burton v. Cruise* (2010) 190 Cal.App.4th 939, 946).  "If more than one reasonable inference may be drawn from undisputed facts, the substantial evidence rule requires indulging the inferences favorable to the trial court's judgment."  (*Davis v. Continental Airlines, Inc.* (1997) 59 Cal.App.4th 205, 211.)  We are required to accept all evidence which supports the successful party, disregard the contrary evidence, and draw all reasonable inferences to uphold the verdict.  Credibility is an issue of fact for the finder of fact to resolve (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613, 622), and the testimony of a single witness, even that of a party, is sufficient to provide substantial evidence to support a finding of fact (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614).

Here, we struggle to find any evidence to support the referee's determination that the amount of the monthly payments was modified from $1,000 to $2,500.  As a threshold matter, we note the referee stated that he

---

8     To the extent the referee interpreted Civil Code section 3302 as a mechanism to accelerate the total amount due on the loan, we disagree with such an interpretation.  That statute concerns damages due for a breach of contract requiring the payment of money.  Nothing in the statute supports adding terms to a contract or otherwise accelerating future payments that would become due under a contract.

did not take any sworn testimony. Thus, there is no witness testimony and no reporter's transcript to review. Rather, the only evidence before us to consider consists of the documents in the appellant's appendix as well as the respondent's appendix.

In his initial report, the referee found that loan payments increased in December 2012 from $1,000 a month to $2,500 a month. Nevertheless, he admitted that it was not clear if the modification "was the result of a formal agreement; and no supporting contracts, emails, or other documents have been produced on this specific issue." The referee's explicit statement about a lack of evidence begs the question: what lead him to conclude the payments had been modified?

It appears the referee relied on a payment schedule provided by Richard. In that schedule, the amount of monthly payment was increased from $1,000 to $2,500 in December 2012. And Richard and Kiley made 13 straight payments of $2,500 before they started to make sporadic payments and then miss regular payments. Yet, as the referee noted and we agree, there is nothing else in the record that even hints that the monthly payments had been modified.

The note underlying the loan explicitly permitted Kiley and Richard to pay down principal in an amount greater than $1,000 a month: "MacDonald has the right to prepay this Note either in full or any part thereof at any time." Therefore, the increased payments are consistent with Kiley and Richard prepaying a portion the loan, but not necessarily an actual modification of the terms of the note.

Although we acknowledge under the deferential substantial evidence standard of review, we are to construe any reasonable inference in favor of the judgment (see *Burton v. Cruise*, *supra*, 190 Cal.App.4th at p. 946);

18

however, that standard is not toothless. "It is well settled that the standard is not satisfied simply by pointing to ' "isolated evidence torn from the context of the whole record." ' [Citations.] Rather, the evidence supporting [court's] finding must considered ' "in the light of the *whole record*" ' 'to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value. . . .' [Citation.]" (*In re I.C.* (2018) 4 Cal.5th 869, 892.)

On the record before us, except for the payments themselves, there is no evidence supporting the conclusion that the monthly payments were modified. In fact, it appears after these payments were made, all parties to the loan referred to monthly payments as being $1,000. For example, in an email dated September 17, 2016, almost four years after the first payment of $2,500 was made, Richard wrote to Kiley: "Finally, you have neglected to pay the $1000/mth that is a direct housing related loan tied to Greer." In correspondence written by Kiley's attorney to Richard's attorney, dated June 30, 2017, reference is made to $1,000 monthly payments required by the loan and Kiley's willingness to pay $500 per month on that loan. There is no indication in the record that Richard's attorney responded to the June 30 letter stating that payments had been modified to $2,500 per month.

In addition, on one of the documents that Richard provided to the referee, it appears Richard added some hand written notes that state: "The terms of [the] loan require payment of $1000/mth. If that is not done, it is in default. Kiley has yet to make a payment on this loan since DOS [date of separation]!" Also, Greer seemed to acknowledge that the loan required monthly payments of $1,000. In a letter dated July 3, 2017, Greer wrote to Kiley that "[t]he loan stipulates payment of $1000/month and provides no stipulation for offset for any previous 'additional pay down of principal.' "

19

Moreover, Greer's July 3 letter appears to be in response to an email from Kiley dated June 30, 2017, wherein Kiley argues the loan was not in default because she and Richard had paid more in total principal at that time then what would have been required under a schedule of $1,000 monthly payments. In other words, Kiley was arguing that the 13 increased payments of $2,500 paid down the principal beyond what was anticipated by the $1,000 per month schedule, and, as such, the loan could not be in default. Greer did not respond to Kiley's email by claiming that the monthly payments had been modified, but, instead, asserted the prepaying of principal in one month, did not relieve Kiley and Richard from making the required $1,000 payment the following month.

Finally, when Richard resumed making payments under the loan while this dispute was pending with the referee, he made monthly payments of $500 or $1,000. These payments are consistent with a $1,000 monthly payment on the loan, not the modified $2,500 payment.

Simply put, we find no evidence in the record that supports the referee's conclusion that the parties agreed to modify the amount of the monthly payments under the loan. To the contrary, the documents provided to the referee make clear that the $2,500 payments that were made merely reflected prepayments of the principal and not a modification. After those payments were made, the parties explicitly referred to $1,000 monthly payments and implicitly agreed that the terms of the loan called for $1,000 monthly payments. The referee erred in determining otherwise. Without the $2,500 monthly payments, the principal of the loan would not have been due before the sale of the community home.

Richard argues that even if we find the referee wrongly decided the entire amount of principal was due before the sale of the community home,

we nevertheless do not need to reverse the judgment because Kiley cannot show she was prejudiced by the error.

Kiley counters that she has been prejudiced by the referee erroneously providing for the acceleration of future payments due under the loan. She explains that the referee's findings required her to pay more now in one lump sum than what she might have to pay over time.

The parties' arguments about prejudice are further complicated by the fact that Richard paid off the principal of the loan in full. Under the terms of the note, the entire amount of deferred interest is now due. Kiley, however, argues that she should not be liable for the immediate payment of the deferred interest, even if the principal was paid in full. She argues that the note defined MacDonald as Richard and Kiley MacDonald. She emphasizes the note states: "MacDonald has the right to prepay this Note either in full or any part thereof at any time." Kiley interprets this language as a restriction on certain terms of the loan. To this end, she asserts that the fixed monthly payment could not be modified unless Greer, Richard, and Kiley all agreed to the change. Likewise, she insists the loan could not be paid off early without her consent. Alternatively stated, despite Richard paying off the note pursuant to the superior court's judgment, Kiley now argues he had no authority to do so under the note. She thus maintains "[t]o hold otherwise would essentially rob Kiley out of the benefit of the bargain."

Initially, we note that Kiley did not argue below that, under the note, Richard could not make a payment beyond the $1,000 monthly payment without her consent. She applied ex parte for an order to allow her to stop payment on the check sent to Greer on Kiley's behalf for her portion of the payment of the loan. Because she was aware that the judgment also called for Richard to pay Greer for what the referee determined he owed under the

21

loan, Kiley then had to know that Richard's payment could possibly pay off the principal owed, requiring the deferred interest to become immediately due per the terms of the note. Even if she could not be certain that Richard's payment would pay off the outstanding principal of the loan, surely she had to realize that such a large payment would result in the principal being paid off in the very near future even if the parties ultimately were ordered to pay $1,000 per month. If she believed that Richard did not have the authority under the note to make that large payment without her consent, she could and should have made that argument to the superior court. This argument would have been especially critical when she applied ex parte to cancel the check she was ordered to pay Greer in the judgment. The superior court could have considered this issue over a year ago and decided, before Greer received Richard's check and deposited it, whether Richard could even make that payment under the note. She did not do so, and, now, for the first time on appeal, she claims Richard had no right to make this payment. Raising this argument for the first time after failing to raise this issue numerous times while she was before the referee and the superior court forfeits this issue on appeal. (See *Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1381 [failure to raise issue in trial court waives or forfeits issue on appeal].) This is especially true here where the alleged unauthorized

22

payment was made over a year ago to a third party over which this court has no jurisdiction.[9]

Additionally, we are not persuaded by Kiley's argument that if we allow Richard's payment to Greer to stand, we are denying her the benefit of the bargain under the loan. It is undisputed in the record that Greer loaned Richard and Kiley $200,000 while they were married "to enable them to finish work on their new home and payoff [*sic*] higher-interest loans they may have." There is nothing in the record that leads us to believe Richard and Kiley did not receive the $200,000 and use it as intended. However, now, Kiley ignores these benefits and distills the crucial benefit of the bargain under the note as the payment schedule. Kiley does not explain why this is the only benefit that matters. Nor does she explain how allowing Richard to

---

[9] Although we conclude Kiley has forfeited this argument, we are not persuaded by her interpretation of the note that Richard could only make a prepayment with her authorization. During Kiley's marriage to Richard, Richard handled the payment of the loan, which included making several monthly payments that far exceeded $1,000. Kiley does not challenge or otherwise take issue with these payments. In fact, she argues to Greer that the increased monthly payments reduced the principal to such an extent that the loan was not in default despite numerous missed payments. Also, the loan was a community debt and either spouse would have had authority to make payments on that debt from community funds. Further, as Kiley admitted to Greer and to the referee, she and Richard were jointly and severally liable under the loan. As such, Greer could seek damages from the breach of the loan from Richard and/or Kiley (and could do so in separate lawsuits). (See *DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 822-823.) If Richard paid off the entire loan, satisfying both his and Kiley's obligations under the loan, then he could seek contribution from Kiley. If Kiley believed that Richard somehow damaged her by paying off the loan early, her remedy would lie against Richard, not Greer. Alternatively stated, Kiley's argument here does not support her claim that Greer must return the money she received from Richard. At most, if not forfeited, Kiley's position would have given her a possible claim against Richard.

pay off the principal of the loan without Kiley's consent denies her the other benefits she received under the note. That said, it does not take much investigation to deduce why Kiley would make such an argument at this juncture.

Greer is elderly. Based on the record, it appears that she is around 80 years old. By the terms of the note, if Greer passes away before the principal is paid in full, all the deferred interest is forgiven. So, if Richard is prohibited from paying off the principal under the loan, and, instead, Richard and Kiley were ordered to resume monthly payments of $1,000 ($500) each, there is a chance that Greer would pass away before the principal was paid in full. If that were to happen, under the terms of the note, all the deferred interest would be cancelled.

We also are keenly aware of the irony of Kiley's position here. She is trying to avoid paying the deferred interest on the note. However, Greer offered to allow Kiley and Richard to pay off the loan out of the escrow of the sale of the community home and would have forgiven all the interest under the loan if they did so. But, unfortunately, they could not agree on the amount owed. Greer demanded $39,500 each from Richard and Kiley. Kiley believed that amount was too high and offered to pay $36,000.[10] Greer's $39,500 demand ultimately expired without a payoff, but she made one more settlement demand, calling for Kiley and Richard to each pay $49,500. Although this demand included some interest, Greer was willing to forgive

———————————

[10] Thus, for $3,500 more than she offered, Kiley could have avoided this appeal and the costs associated with it.

24

the majority of the interest and the amount each party would have paid was significantly less than the amount calculated by the referee.[11]

This all said, we agree with Kiley that the referee erred in finding that the entire amount was due under the note before the sale of the community home. This finding caused the referee to calculate the interest due at that point, which would have prejudiced Kiley because, under the terms of the note, no interest was due until the principal was paid in full. Thus, we agree with Kiley on this limited issue, that reversal of the judgment is warranted. However, we do not agree with Kiley regarding the effect of the reversal.

Kiley contends that if we reverse the judgment as to the loan, then by operation of law, the $63,396.83 payment Richard made to Greer would be undone. Yet, she provides no authority to support her position. Neither case cited by Kiley for this proposition (*Coldwell Banker & Co. v. Department of Insurance* (1980) 102 Cal.App.3d 381 and *Noack v. Zellerbach* (1936) 14 Cal.App.2d 249) involved a reversal of judgment requiring a third party to return a payment that the third party received and was owed, particularly after the third party received the payment over a year before the reversal. Further, Kiley does not explain how either case is analogous to the situation here.

In addition, we are not persuaded by Kiley's argument that, after reversal, she could simply amend the pleadings to join Greer so that Richard's payment to Greer could be undone. The only basis she advances for unwinding the payment is her claim that Richard was not authorized under the note to prepay the outstanding principal without her consent. As we

---

[11] Although we do not attribute any untoward conduct on Kiley's behalf in rejecting these settlement demands, we include this brief discussion of them to ensure the superior court considers the parties' actions in determining what they owe upon reversal.

noted previously, Kiley did not make that argument below. As such, the argument is forfeited, and she is not permitted to revive that argument after reversal.[12]

Moreover, Kiley's contention ignores the unique circumstances presented here. Richard paid Greer $63,396.83 in late July or early August 2019. Thus, Greer has had the money for well over a year. Although there is some dispute about the timing of the payment and whether it could have been paid in one lump sum, there is no dispute that Greer was entitled, under the note, to payment of the outstanding principal of the loan. There is no argument that Greer acted improperly. Rather, the record underscores that Greer tried to settle the dispute over the loan on terms that were very favorable to Richard and Kiley. Now, after reversing the judgment in part, to allow Kiley to amend the pleadings to add Greer for the sole purpose of requiring Greer to return money, she was owed and paid over a year ago, borders on cruel and undermines the equity of the situation. We will not countenance such a result on the record before us.

In summary, we conclude that substantial evidence does not support the referee's determination that the parties modified the monthly payments to $2,500. Without that modification, the principal of the loan would not have been due before the community home was sold. Therefore, the referee's calculation of the interest due at that time was in error because it was based on the entire principal being due or paid off before the community home was

---

[12]   Additionally, Kiley does not offer any authority that supports her position that, after this matter is reversed, she could amend the pleadings to add Greer as a party and force her to refund a $63,396.83 payment she received over a year ago through no fault of her own and to which she was entitled.

sold. Consequently, the amount the referee determined that Richard and Kiley owed under the loan was improperly calculated.

We thus reverse the judgment in part and remand this matter to the superior court to determine certain issues related to the loan on a very limited and focused basis. Upon remand, the superior court is to determine when the principal of the loan was paid in full and calculate the amount of interest due based on that date. Moreover, the court should also determine the amount Kiley and Richard each owe to pay off that interest.[13] We offer no opinion as to how the court is to make that determination, but we trust the court to properly exercise its discretion while considering the applicable law as well as equity and fairness. Also, of course, the court may consider what it has already ordered the parties to pay as part of the dissolution of marriage and the subsequent judgment based on the referee's statement of decision. In all other respects, the judgment is affirmed.

## DISPOSITION

The judgment is reversed in part. On remand, the superior court is to: (1) determine when the loan was paid off, (2) calculate the amount of interest due under the note, and (3) determine the amount each party will pay of that interest. In all other respects, the judgment is affirmed.

Nothing in this opinion should be read to require or allow the parties, through the instant action, to cause Greer to return the $63,396.83 she

---

[13] It might be prudent to make sure Greer agrees as to when the loan's principal was paid in full as well as to the accuracy of the interest calculation. This would prevent additional litigation by Greer against Kiley and Richard to recover what she believes is due under the loan.

received from Richard in July or August 2019 in relation to the loan.  In the interest of justice, each side will bear their own costs on appeal.


                                        HUFFMAN, Acting P. J.

I CONCUR:


HALLER, J.

O'Rourke, J., concurring in part, dissenting in part.

In this case, a referee made a factual finding that appellant Kiley MacDonald and respondent Richard MacDonald had modified a loan contract by increasing their monthly payments from $1,000 to $2,500 per month.  The loan, evidenced by a written promissory note referring to appellant and respondent collectively as MacDonald, expressly allows such an increase, providing in part:  "Upon mutual agreement between [lender] and MacDonald, the Fixed Monthly Installment of Principal may be increased or decreased."  The referee had before it respondent's spread sheet detailing the parties' payment history from March 2007, showing they made $1,000 monthly loan payments, then $2,500 monthly loan payments starting in December 2012 for approximately one year.  Neither party disputed the accuracy of that evidence below.  (Maj. opn. *ante*, at p. 9, fn. 5.)

Pointing to the absence of live witness testimony and reporter's transcript, the majority nevertheless concludes the record lacks substantial evidence to support that finding (Maj. opn. *ante*, pp. 8, fn. 3; 18), and reverses the judgment in part on that basis.  I respectfully dissent from that portion of the opinion.

When this court reviews factual findings, our power " 'begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' which will support the findings, and when 'two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the [fact finder].' " (*Nichols v. Mitchell* (1948) 32 Cal.2d 598, 600-601, quoting *Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429; see also *In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598.)  Findings supported by

substantial evidence are "conclusive on appeal." (*Harris v. Joffe* (1946) 28 Cal.2d 418, 425.)

In my view, the referee reasonably deduced from the uncontested spreadsheet that the borrowers made, and the lender accepted, the increased payments on the note. The parties' execution in this respect modified the loan contract without need for a writing. "A contract in writing may be modified by an oral agreement *to the extent that the oral agreement is executed by the parties.*" (Civ. Code, § 1698, subd. (b), italics added; see also *Diamond Woodworks, Inc. v. Argonaut Insurance. Co.* (2003) 109 Cal.App.4th 1020, 1038 ["where the subsequent conduct of parties is inconsistent with and clearly contrary to provisions of the written agreement, the parties' modification setting aside the written provisions will be implied"], overruled on other grounds in *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1182.) "When one party has, through oral representations and conduct or custom, subsequently behaved in a manner antithetical to one or more terms of an express written contract, he or she has induced the other party to rely on the representations and conduct or custom. In that circumstance, it would be [] inequitable to deny the relying party the benefit of the other party's apparent modification of the written contract." (*Wagner v. Glendale Adventist Medical Center* (1989) 216 Cal.App.3d 1379, 1388.) This principle applies even to contracts with a no-oral-modification provision, where the evidence shows the parties waived such a provision by their conduct. (See *Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125, 141; accord, *Wind Dancer Production Group v. Walt Disney Pictures* (2017) 10 Cal.App.5th 56, 78.)

Because this court is bound to accept any reasonable inference from the evidence to support the findings and judgment, it is irrelevant that there is

2

other evidence—the parties' later treatment of the loan as requiring a $1,000 monthly payment—permitting a different inference, such as that the payments reflected prepayments of the principal. I would therefore uphold the referee's factual finding as supported by the fact of the parties' conduct. The judgment should be affirmed in full.

O'ROURKE, J.